**Larry D. CARMICHAEL,
Plaintiff-Respondent,**

v.

**Robert O. WIESEMANN II and
Continental Carbonic Products,
Inc., Defendants-Appellants.**

No. WD 38696.

Missouri Court of Appeals,
Western District.

Sept. 1, 1987.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Oct. 27, 1987.

878

G. Stephen Long, Kirk J. Goza, Shughart, Thomson & Kilroy, Kansas City, for defendants-appellants.

J.C. Hambrick, Jr., Schulz, Bender, Maher & Blair, Kansas City, for plaintiff-respondent.

Before TURNAGE, P.J., and BERREY and GAITAN, JJ.

TURNAGE, Presiding Judge.

Larry Carmichael brought suit against Robert O. Wiesemann II and Continental Carbonic Products, Inc. in several counts. The case was submitted to the jury on the theory of slander. All other counts have been abandoned. The jury awarded Carmichael $6,000 actual damages and $5,000 punitive damages from Continental and $6,000 punitive damages from Wiesemann II. The court entered judgment on the verdict. Continental and Wiesemann now contend that the evidence was insufficient to support the verdict. Reversed.

Continental was in the business of buying and selling dry ice. Its main office was in Chicago and it had a branch in Kansas City. Continental was owned by Robert O. Wiesemann, Sr., and his son Robert Wiesemann II was a vice-president. Another son, Joe, was also employed in the business.

The Kansas City office was managed by Carl Noelke. Carmichael was an employee working under Noelke. The other employee in the Kansas City office was Alexander.

Part of the operation of the Kansas City office was the sale of ice to walk-in customers. These sales were sometimes on account but more often were cash. Continental had established procedures for cash sales which required the employee to fill out a receipt in four copies. Continental attempted to keep close records of cash sales because of the nature of dry ice which was its only salable product. Dry ice will sublimate, that is it will return to its original form as a gas. The sublimation takes place gradually over a period of time. Because the dry ice Continental held for sale would sublimate, it was impossible to keep an inventory of the amount of dry ice on hand. For that reason it was important

to keep accurate records concerning cash sales otherwise the disappearance of dry ice could not be attributed to a sale rather than the process of sublimation.

Early in 1983, Joe Wiesemann spent two weeks in the Kansas City branch becoming familiar with its operations. Joe spent one of the weeks with the drivers outside the office. The other week he spent in the office.

Wiesemann II reviewed the records from the Kansas City office and observed that the week Joe spent in the office showed an abnormally high volume of cash sales. Wiesemann II testified that he observed that the sales for that week totaled $112. He looked at several weeks before and after and discovered that sales for that week were at least 10–20 times greater than those of any other week checked. Wiesemann stated that this caused him to wonder if cash sales were being properly recorded during that week because of the presence of Joe which led to the suspicion that during other weeks cash sales were being made but were unreported. Wiesemann discussed his finding with his father and it was decided to hire an investigative firm. The firm caused a person to visit the Kansas City office on three separate days and make cash purchases. The firm gave a report to Wiesemann in which the "shopper" described his purchase. He described the physical appearance of the employee making the sale and the transaction. From the description in the report it became apparent that two purchases were made from Alexander and one from Carmichael. In two of the three purchases the employee did not use the procedure of giving a receipt even though the shopper paid cash for the dry ice. In the purchase involving Carmichael the shopper reported that he gave Carmichael $10.56 in cash and Carmichael put the money in his pocket but did not give a receipt.

On reviewing the report Wiesemann found that of the three purchases made by the shopper only one receipt had been given. That receipt was a part of a receipt packet which had been used in April of 1981. Wiesemann testified that the receipt given had obviously been removed from the four-part packet in 1981 before the other three parts were used to record a sale made at that time.

Wiesemann also checked the records and found there was no record of the $10.56 sale made by Carmichael to the shopper. Wiesemann said that he checked several days surrounding the date the shopper made the purchase to make sure that the sale was not reported at a different time. He could never locate any record of the sale.

The report indicated that two of the three employees in the Kansas City office had made sales without following company procedure so Wiesemann wondered if the third employee, which would have been Noelke, was involved in making sales contrary to company policy. He hired another investigator and another shopper visited the Kansas City office and made three purchases. These three purchases were handled according to proper procedure. Although it is not clear from the record, a fair inference is that the second set of three purchases were made from Noelke.

Weisemann talked with his father and they agreed that with two out of three employees making sales contrary to policy that they had a problem and should go to Kansas City to investigate. The two traveled to Kansas City to talk with the three employees. Carmichael had no recollection of the cash sale for which no record could be found but denied taking any money. Wiesemann requested that Carmichael take a lie detector test and told him that he was suspended pending the test result.

Carmichael took the lie detector test early the next morning and during the pretest interview Carmichael admitted borrowing money from the cash box where receipts from cash sales and the company petty cash was kept. This practice was also against company policy. Wiesemann was told by the polygraph examiner that Carmichael showed deception on questions concerning whether or not he would tell the truth during the examination and on whether or not he had stolen money from

the company.[1] On reviewing the report Wiesemann terminated Carmichael.

Wiesemann decided to call the police department into the investigation and gave the information he collected to Detective Parker. Parker later interviewed Carmichael and issued a general ordinance summons to Carmichael on a charge of stealing.

While in the Kansas City office on April 13, 1983, Wiesemann looked in a desk which was in a common area but apparently was used mostly by Alexander and found two other receipts that had been taken from packets which had been used some years before.

On April 15, Wiesemann suggested to Noelke that they audit the cash box. This revealed that there was $80 more in cash than the records indicated. Wiesemann stated that this was unusual because the cash box had been constantly running out of cash.

After Carmichael was terminated Noelke inquired of Wiesemann as to the explanation he should give customers when they inquired about the absence of Carmichael. Wiesemann told him to tell the truth and to say that Carmichael had been fired for stealing. Noelke testified that he did so and told several customers.

When Parker was told that the cash box showed an overage of $80 he consulted with the city prosecutor and it was decided to dismiss the charge of stealing against Carmichael. The prosecutor felt that the overage would make it difficult to prove a stealing charge. Parker stated that based on the facts contained in the investigator's report and the result of the polygraph examination that he would have been suspicious that Carmichael was stealing.

Noelke testified that based on the facts known to Wiesemann he would have terminated Carmichael for stealing. Captain Hermann of the Olathe Department of Public Safety qualified as an expert police officer and testified that based on the facts known to Wiesemann, he would have suspected Carmichael of stealing and would have sought to have him charged with a crime.

Carmichael testified that he had not stolen any money. Noelke testified that on one occasion Carmichael had brought in some cash that he had found in his pocket. This was left from cash Carmichael had taken to cover expenses for making a delivery out of town. The thrust of Carmichael's evidence was to disprove that he had stolen any money rather than to show that Wiesemann knew the statements were false or entertained serious doubt as to their truth.

Carmichael submitted his case to the jury by a verdict director based on MAI–3rd 23.10(2) which required the jury to find that Wiesemann said that Carmichael had stolen money or had been fired for stealing from Continental with knowledge that such statements were false or with reckless disregard for whether such statements were true or false at a time when Wiesemann had serious doubt as to whether they were true.[2] That instruction was given because it was felt that the statement was subject to a qualified privilege.[3]

■ Wiesemann and Continental contend that the evidence was insufficient to show the existence of actual malice as required by the verdict director. In *Carter v. Willert Home Products, Inc.*, 714 S.W. 2d 506, 513 (Mo. banc 1986), the court said that MAI–3rd 23.10(2) incorporates the malice standard in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

In *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 511, 104 S.Ct. 1949,

1. The court instructed the jury that the result of the polygraph examination was not to be considered as any evidence of the truth or falsity of any statement made by Wiesemann.

2. A verdict director also allowed recovery against Continental on a finding that Continental made the same statement as Wiesemann.

That instruction referred to the statement as being made by Continental without naming any individual.

3. The existence of a qualified privilege requires the giving of an instruction in the form of MAI–3rd 23.10(2). *Brown v. P.N. Hirsch & Co. Stores, Inc.*, 661 S.W.2d 587, 590[2] (Mo.App.1983).

1965 n. 30, 80 L.Ed.2d 502, 524, n. 30 (1984), the court stated in connection with the actual malice standard in *New York Times:*

> The burden of proving "actual malice" requires the plaintiff to demonstrate with clear and convincing evidence that the defendant realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement. (citations omitted).

Thus, Carmichael had the burden to prove by clear and convincing evidence that Wiesemann realized that the statement in which he said that Carmichael had stolen, or that he was fired for stealing, was false or that Wiesemann subjectively entertained serious doubt as to the truth of such statements. It is clear from the facts that there is no evidence that Wiesemann knew that his statement that Carmichael had been stealing and that he was fired for stealing was false. Wiesemann testified that he based his statement on the investigator's report which gave the account of the shopper purchasing dry ice from Carmichael, the check of the records that Wiesemann performed which revealed that the sale made by Carmichael had not been recorded, and the result of the polygraph examination. In view of these facts he stated that he felt he had no choice but to terminate Carmichael because of stealing. Carmichael did not dispute the existence of the facts upon which Wiesemann said he acted.

There is no evidence that Wiesemann had any ulterior motive in firing Carmichael. In fact, the evidence is just the opposite with Wiesemann stating that it caused a hardship to fire Carmichael and it cost the company money because it required the replacement of an experienced employee with one who was not experienced.

 Carmichael argues in his brief that the fact that the cash box was $80 over was evidence from which a jury could believe that Wiesemann had serious doubt concerning the truth of the statement that Carmichael had stolen. Wiesemann testified that he did not take the cash surplus as evidence disproving that Carmichael had been stealing because someone could have placed the surplus cash in the box to divert suspicion; when the surplus was discovered Carmichael had already been terminated, and it was well known that Wiesemann thought that Carmichael had been stealing.[4] There was nothing in this evidence to show that Wiesemann subjectively entertained any doubt as to the truth of his statement concerning Carmichael. Carmichael argues that the increase in cash sales which originally triggered Wiesemann's suspicions took place when Joe was in the warehouse with other employees and not Carmichael. Wiesemann did not rely solely on the increase in sales during one week as a basis for the conclusion that Carmichael had been stealing. That was simply the fact which caused Wiesemann to launch the investigation.

Carmichael finally argues that there was no increase in sales after the termination of Carmichael. This, of course, is an after the fact argument which would have no bearing on Wiesemann's belief in the truth of his statements at the time they were made.

This court concludes that Carmichael failed to meet the burden of proof cast upon him to show the existence of actual malice.

The judgment is reversed.

All concur.

---

4. Carmichael contends this argument is pure speculation. The fact is that the evidence of the cash overage is fraught with speculation. There was no periodic audit of the cash box so there was no evidence as to when or over what period of time the overage occurred.