**Serita WRIGHT, Appellant/Cross–Respondent,**

v.

**OVER–THE–ROAD AND CITY TRANSFER DRIVERS, HELPERS, DOCKMEN AND WAREHOUSEMEN, Local Union No. 41, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Respondent/Cross–Appellants.**

Nos. WD 50492, WD 50501.

Missouri Court of Appeals, Western District.

March 25, 1997.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 29, 1997.

Application to Transfer Denied June 17, 1997.

Lynne Jaben Bratcher, Marie Lynne Gockel, Kansas City, for appellant/cross-respondent.

Donald R. Aubry, Kansas City, for respondent/cross-appellants.

Before ULRICH, C.J., P.J., and SPINDEN and EDWIN H. SMITH, JJ.

PER CURIAM.

Serita Wright (Wright) brought suit, *inter alia*, for defamation and for sexual harassment under Title VII of the 1964 Civil Rights Act against Over-the-Road and City Transfer Drivers, Helpers, Dockmen and Warehousemen, Local Union No. 41, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (the Union) for the manner in which it handled her sexual harassment complaint against fellow employee and union member, Dale Dorner (Dorner). Wright appeals from a judgment granting the Union a directed verdict on her defamation claim and reducing the damages on her jury verdict for sexual harassment. The Union cross-appeals Wright's jury verdict for sexual harassment.

Wright asserts four points on her appeal. Point I deals with her defamation claim against the Union, and Points II—IV deal with her sexual harassment claim against the Union. In Point I, she claims the trial court erred by granting the Union's motion for a directed verdict and failing to grant her motion for new trial. In Points II and III, she alleges that the trial court erred in reducing her actual damages award on her sexual harassment claim from $250,000 to $50,000 based upon the damage cap found in 42 U.S.C. § 1981. In Point IV, she claims that the trial court erred in granting the Union's motion for judgment notwithstanding the verdict setting aside Wright's award of punitive damages. The Union asserts four points on its cross-appeal, all dealing with Wright's jury verdict on her sexual harassment claim. Points I and II address the Union's allegations of jury instruction error. In Point III, the Union charges that the trial court erred in allowing Wright to introduce inadmissible evidence. Point IV alleges that the trial court erred in not granting the Union's motion for a directed verdict at the close of Wright's evidence or in the alternative, the Union's motion for JNOV.

As to Wright's defamation claim, we find that the trial court erred in granting the Union's motion for directed verdict on the basis that statements published in the course of a union grievance proceeding are absolutely privileged, finding instead, that in Missouri, statements made in such a proceeding only enjoy a qualified privilege. However, we find the error was not reversible error in that there was no evidence from which a reasonable jury could infer that the alleged false and defamatory statements in question were published by the Union with "actual malice," which is necessary to defeat a qualified privilege and to make a submissible case of defamation against the Union. Thus, we affirm the trial court's judgment entering a directed verdict for the Union on Wright's claim of defamation.

As to Wright's Title VII hostile-work-environment sexual-harassment claim against the Union, we find the trial court erred in denying the Union's motion for directed verdict at the close of Wright's evidence, or in the alternative, its motion for JNOV. We reverse and remand because we find that there was *insufficient evidence from which a reasonable jury could infer that:* 1) the Union's response to Wright's sexual harassment complaint against Dorner was unreasonable and inadequate to cause his sexual harassment to cease, a prerequisite to a union's Title VII liability for sexual harassment when the basis for the claim is the union's alleged refusal to represent the union member on a grievance concerning the sexual harassment; and, 2) the Union retaliated against Wright for pursuing her sexual harassment complaint against Dorner by knowingly publishing false and defamatory statements about her in the union grievance proceeding.

## Facts

Serita Wright began working as a truck driver for United Parcel Service, Inc. (UPS), in August, 1991. After her first month of employment, Wright became a member of the Union, which serves as the bargaining representative for local bargaining unit employees for UPS. The collective bargaining agreement between the Union and UPS provides for employee grievances with a procedure that has various levels of dispute hearings, concluding with a Two-state Joint Committee hearing.

The Union and UPS are parties to a collective bargaining agreement governing the relationship between UPS and its employees. This agreement provides a grievance procedure for the adjustment of employment disputes arising under the collective bargaining agreement. Disputes that cannot be resolved at the local level proceed to hearing before various levels of joint committees. These committees are composed of equal numbers of members appointed by the Union and from UPS management. None of the committee members in a particular case can be a member or representative of the local involved in the dispute or a member of management at the terminal where the grievance arose.

After a fellow employee and union member, Dale Dorner, began making sexually offensive comments to Wright, she complained to her assigned union steward, Mario Rojas. Rojas, who was responsible for representing union members on employment issues, met with Wright to discuss the harassment. Upon learning of her complaint, Rojas indicated he would speak to Dorner about his conduct and assured Wright the situation would be taken care of. At this first meeting, Wright did not request a grievance form or that a formal grievance be filed seeking Dorner's termination.

The day after her meeting with Rojas, Wright requested a grievance form from him and that the Union file a formal grievance concerning her complaint against Dorner. Rojas refused to provide her with a grievance form as she requested. He advised her that he would handle her complaint and that she could not file a grievance. He also advised her that: "You've already pissed a bunch of guys off over what's going on now. I've got some guys that are going to say that when a male driver grabbed his penis and said you asked could you grab it, too." When she was denied a grievance form by Rojas, she immediately obtained one from UPS management, which she filed with management unsigned by the Union, requesting the termination of Dorner and for Rojas to step down as a union steward, because of his lack of cooperation.

UPS suspended, then fired Dorner, after an investigation and meeting between members of management, Dorner, and Rojas concerning Dorner's conduct. After Dorner's termination, the Union requested a joint committee hearing to challenge his termination as provided for in its collective bargaining agreement with UPS. Dorner, Wright, Wright's husband, union officials, and the six-member committee were all present at the hearing. This hearing was informal, with no rules of evidence, administration of oaths, opportunity for cross-examination, or summoning of witnesses. At the hearing, a union business agent, Harold McLaughlin, presented statements in Dorner's defense that Dorner had solicited from ten of his co-workers. The statements suggested that Dorner's actions toward Wright were not unwelcome in that Wright, herself, engaged in offensive conduct and used foul language, so Dorner should not be disciplined for similar conduct.

After the hearing, Dorner was reinstated by the Committee. However, nine months later, he was terminated for sexually assaulting a customer off-premises, which termination was subsequently upheld by the Committee. After Wright made her complaint to Rojas, there were no further incidents of sexual harassment by Dorner of Wright.

Wright originally brought suit against the Union for "Sexual Discrimination," "Battery," "Breach of Duty of Fair Representation," and "Defamation." The claim of battery was voluntarily dismissed before trial. At trial, the court dismissed Wright's separate claim of breach of unfair union representation from which she does not appeal. At

trial, the court also dismissed Wright's claim for defamation from which she does appeal. Wright's claim of sexual discrimination was submitted to the jury. The jury found in favor of Wright on this claim and awarded $250,000 actual and $400,000 punitive damages. Post-trial, the trial court sustained the Union's motion for JNOV as to the punitive damages award. The trial court also sustained the Union's motion for JNOV as to the award of actual damages, reducing the amount of actual damages to $50,000 pursuant to 42 U.S.C. § 1981a (b)(3)(A). The court overruled Wright's motion for new trial on her defamation claim, as well as the Union's motion for JNOV or in the alternative for a new trial as to the sexual harassment verdict.

### *Wright's Appeal*

**I. Grant of Union's Motion for Directed Verdict and Denial of Wright's Motion for New Trial as to Wright's Defamation Claim**

In Point I, on her claim for defamation, Wright contends that the trial court erred in granting the Union's motion for a directed verdict at the close of her evidence and in failing to grant her motion for new trial. The trial court, in sustaining the Union's motion for directed verdict and in denying Wright's motion for new trial, held that the Two-state Joint Committee hearing was a quasi-judicial proceeding, and, as such, the Union enjoyed absolute immunity as to any false and defamatory statements published in the course thereof. Wright contends that the Union was not entitled to absolute immunity, but only qualified immunity, and that she presented sufficient evidence to overcome this immunity and submit to the jury the issue of the Union's liability for publishing false and defamatory statements about her in the hearing. The Union argues that the trial court was correct in directing a verdict for it in that the hearing was quasi-judicial in nature, according it absolute immunity for its use of the statements in question. In the alternative, it argues that even assuming it only had qualified immunity, Wright did not make a submissible case of libel in that she failed to present evidence from which a reasonable jury could find actu-al malice by the Union in the publication of the statements sufficient to destroy the Union's defense of qualified immunity. *See Carter v. Willert Home Products, Inc.,* 714 S.W.2d 506, 511 (Mo. banc 1986) (holding that in order to overcome qualified immunity, plaintiff has the burden to show actual malice). In addition, the Union argues that: 1) the National Labor Relations Act (NLRA) preempted the state remedy of libel; and 2) Wright waived her claim for defamation by consenting to the use of the statements. The Union on its cross-appeal does not contend that the statements were not false or defamatory, but only that it was shielded from liability by the defense of immunity, either absolute or qualified.

### A. Standard of Review

"In reviewing a trial court's order granting a directed verdict in favor of defendant, the appellate court will determine whether the plaintiff has introduced substantial evidence that tends to prove the facts essential to plaintiff's recovery," or in other words, whether plaintiff has made a submissible case. *Wilkerson v. Mid–America Cardiology,* 908 S.W.2d 691, 695 (Mo.App.1995); *see also Friend v. Holman,* 888 S.W.2d 369, 371 (Mo.App.1994). In making this determination, the appellate court "must review the evidence in the light most favorable to the plaintiff, giving him or her the benefit of all reasonable inferences, and disregarding defendant's evidence except as it aids the plaintiff's case." *Wilkerson,* 908 S.W.2d at 695.

The grant of a directed verdict is a drastic measure. *Friend,* 888 S.W.2d at 371. There is a presumption in favor of reversing a trial court's grant of a motion for a directed verdict unless, upon consideration of the facts most favorable to the plaintiff "those facts are so strongly against the plaintiff as to leave no room for reasonable minds to differ as to a result." *Friend,* 888 S.W.2d at 371.

The denial of a motion for new trial is reviewed for abuse of discretion. *Kansas City v. Keene Corp.,* 855 S.W.2d 360 (Mo. banc 1993). In order for the trial court to

grant a motion for new trial, the error complained of as a basis for the motion must be prejudicial to the party seeking the new trial. *VonSande v. VonSande,* 858 S.W.2d 233, 236 (Mo.App.1993). Here, because the basis for the grant of the motion for a directed verdict and the denial of the motion for new trial are the same, if we affirm the trial court's order granting the Union's motion for a directed verdict, we necessarily must affirm its order denying Wright's motion for new trial. Thus, our review on this point will be for error as to the trial court's grant of the Union's motion for directed verdict.

## B. Discussion

 To establish a defamation claim, it is necessary to show that the alleged false and defamatory statements were in some way published or communicated. *Jones,* 700 S.W.2d at 459. In her petition, Wright did not plead that the Union was vicariously liable for the alleged defamatory statements made by its union members. Rather, she pled that the Union libeled her by "publishing" the alleged defamatory statements about her to "union members and UPS employees at the two-state hearing." L.F. 7. Thus, it is this publication by the Union and the circumstances surrounding it that is the focus of our review.

We believe it is important to note that the issue of whether a Union employee published the statements in the scope and course of his employment was not raised by the Union. *See Carter,* 714 S.W.2d at 511 (holding that in order for an employer to be liable for libelous statements made by an employee, the employee must be within scope and course of employment when publication of statements occurred). Even if it had been, McLaughlin admitted in his testimony that as the business agent for the Union he published the statements in the course of the Union's representation of Dorner at the Two-state Joint Committee hearing. The record reflects that McLaughlin published the statements by providing copies of them to UPS management and by submitting them to the Committee as evidence in support of reinstating Dorner, as well as reading out loud at the hearing two of the statements.

Because the trial court based its grant of the Union's motion for directed verdict on a determination that the use of the allegedly defamatory statements by it at the arbitration hearing was absolutely privileged, the first issue for us to decide is whether their use was, in fact, absolutely privileged.

 Privilege, as a defense to libel, can either be absolute or qualified. *Hester v. Barnett,* 723 S.W.2d 544, 557 (Mo.App.1987). The distinction between an absolute and a qualified privilege is critical to Wright's claim of error in Point I given its effect on the quantity and type of evidence that was required of her in order for her to have survived the Union's motion for directed verdict at the close of plaintiff's evidence. "Privilege, absolute or qualified, is a complete defense against liability for libel" regardless of whether the statement published is false and defamatory. *Hester,* 723 S.W.2d at 557 (citation omitted). However, actual malice in the publication of a statement will destroy the immunity of a qualified privilege, but not that of an absolute privilege. *Id.* at 557. In cases of qualified privilege, "it is necessary for the plaintiff to prove, in order to recover, that the defamatory statement was made with actual malice." *Smith v. UAW–CIO Federal Credit Union,* 728 S.W.2d 679, 683 (Mo.App.1987). The determination of whether the defense of absolute or qualified privilege exists is a question for the court and not the jury. *Hellesen v. Knaus Truck* Lines, 370 S.W.2d 341, 345 (Mo.1963); *Estes v. Lawton–Byrne–Bruner Ins. Agency Co.,* 437 S.W.2d 685, 691 (Mo.App.1969). The question of malice is a jury question, "unless there is no substantial evidence of express or actual malice, in which case the court should direct a verdict." *Estes,* 437 S.W.2d at 691 (citations omitted).

Wright contends that the issue of whether there exists an absolute or qualified privilege for statements published in the course of a union grievance proceeding has already been decided in this state in her favor, citing *Pulliam v. Bond,* 406 S.W.2d 635 (Mo.1966); *Gabauer v. Woodcock,* 520 F.2d 1084 (8th Cir.1975), *cert. denied,* 423 U.S. 1061, 96 S.Ct. 800, 46 L.Ed.2d 653 (1976). The Union disagrees, and in support of the trial court's

ruling finding absolute immunity, cites us to *Barchers v. Missouri Pac. R. Co.*, 669 S.W.2d 235 (Mo.App.1984). Logically, before addressing Wright's claim that *Pulliam* is controlling here, we must first address the Union's claims in reliance on *Barchers*.

*Barchers* dealt with a libel action brought by a railway company employee against the company based upon allegedly defamatory evidence adduced at a grievance arbitration hearing. The dispute was governed by the Railway Labor Act. In *Barchers*, the Eastern District of this court reversed a judgment for libel for the employee against the railroad employer on three bases: 1) because the dispute was governed by the Railway Labor Act, the state remedy for libel was preempted by federal law; 2) the employee waived his claim of libel by consenting to the use of the allegedly libelous statement at the hearing; and 3) the publication of the statement in question, during the course of proceedings before the Public Law Board, was absolutely privileged because the Board was a quasi-judicial body. *Barchers*, 669 S.W.2d at 238. The Union contends on appeal that all three of these bases apply here to deny any liability on its part for defamation, primarily relying on a claim of absolute immunity based upon its claim that the Two-state Joint Committee hearing was quasi-judicial in nature, the same basis relied upon by the trial court here in sustaining the Union's motion for directed verdict.

We can make short work of the Union's claims of federal preemption and consent. We find neither apply here. Federal preemption does not apply because the National Labor Relations Act, unlike the Railway Labor Act in *Barchers*, does not supersede the state remedy of libel. *Barchers*, 669 S.W.2d at 237; *See Linn v. United Plant Guard Wkrs. Of Amer., Loc. 114*, 383 U.S. 53, 63, 86 S.Ct. 657, 663, 15 L.Ed.2d 582 (1966). As to consent and waiver, they do not apply, in that although Wright in her grievance requested, *inter alia*, that UPS terminate Dorner for sexual harassment, which did lead to his termination by UPS and the resulting Two-state Joint Committee hearing being requested by Dorner, she at no time consented to the use by the Union of the allegedly false and defamatory statements at the hearing.

Inasmuch as the first two bases do not apply, the only viable basis under *Barchers* for the Union's avoidance of liability for its use of the alleged false and defamatory statements in question here would be a determination that the Two-state Joint Committee hearing, where they were published, was quasi-judicial in nature. Thus, we return to Wright's claim that this issue has already been decided in her favor in *Pulliam*.

*Pulliam* involved a libel action by one member against two other members of the Executive Committee of the Joint Protective Board Brotherhood Railway Carmen of America on the Missouri Pacific System and Allied Lines. The claim of libel was based on a written statement charging the plaintiff with misconduct in his official capacity with the Brotherhood, which was referred to the committee for disciplinary action pursuant to the rules and bylaws of the Brotherhood. Finding that the Brotherhood had the attributes of a lodge and labor union, the Missouri Supreme Court, held

"... that a qualified privilege attaches to statements and communications made in connection with the various activities of such organizations as lodges, societies, **labor unions,** etc. Thus, it is well settled that members of such bodies may report on the qualifications of applicants, prefer charges against fellow members, offer testimony in support of the charges, and make proper publication of any disciplinary action that may be taken, without liability for any resultant defamation, so long as they act without malice."

*Pulliam*, 406 S.W.2d at 641 (emphasis added). In holding that absolute immunity did not apply, the *Pulliam* court necessarily found that a union activity similar to the activity of the Brotherhood under review was not a judicial, legislative or executive proceeding or one required by law. Thus, although *Pulliam* did not involve a union grievance proceeding as does the case at bar, it does stand for the proposition that in this state only a qualified privilege exists as to statements made in the course of union "activities."

The question then becomes whether a union grievance proceeding, such as the Two-state Joint Committee hearing, is an "activity" encompassed by the holding in *Pulliam*, invoking a qualified privilege as to the statements published by the Union at the hearing, or is it a quasi-judicial proceeding invoking an absolute privilege? Wright contends it is a union activity described in *Pulliam*. The Union contends it is not, because the holding in *Pulliam* is limited solely to the internal workings of the organization or union, whereas the grievance proceeding here involved the determination of contractual rights between an employee and union member and an employer pursuant to a collective bargaining agreement. Thus, in deciding whether *Pulliam* is controlling, the question is presented: Is the union grievance proceeding in question here simply a union activity encompassed by the holding in *Pulliam* that vests the Union with only a qualified privilege as to statements published by it in the course thereof; or, is it a quasi-judicial proceeding that vests it with absolute immunity?

■ In defamation cases, this jurisdiction has traditionally eschewed absolute immunity in favor of qualified immunity.

Absolute immunity as to defamatory publications is confined to the few situations "where there is an obvious policy in favor of permitting complete freedom of expression, without any inquiry as to the defendant's motives." W. Prosser, Law of Torts § 114, at 777. Absolute privilege ensures the public policy of freedom of speech " 'where it is essential that freedom speech should exist.' " *Laun v. Union Electric Co.*, 350 Mo. 572, 578, 166 S.W.2d 1065, 1068[11]. The occasions for the absolute privilege are limited and extend to judicial, legislative or executive proceedings [among others], and "to occasions where the communication is provided for and required by law." *Pulliam v. Bond,* 406 S.W.2d 635, 640[1, 2] (Mo.1966).

*Hester,* 723 S.W.2d at 557. "Other occasions" has been found to include proceedings that involve a constitutional privilege, *Hester,* 723 S.W.2d at 557, or proceedings, which although not judicial, are quasi-judicial, *Remington v. Wal–Mart Stores, Inc.,* 817 S.W.2d

571, 574 (Mo.App.1991); *Barchers,* 669 S.W.2d at 237. "It is a common law principle that statements made in the course of judicial proceedings are absolutely privileged. *Henry v. Halliburton,* 690 S.W.2d 775 (Mo. banc 1985)." *Remington,* 817 S.W.2d at 574. "This principle is generally held applicable to a quasijudicial proceeding." *Id.*

In *State ex rel. McNary v. Hais,* 670 S.W.2d 494, 496 (Mo. banc 1984), the Missouri Supreme Court, in determining whether a proceeding was quasi-judicial in nature, relied on the following definition: "Quasi-judicial is [a] term applied to the action * * * of public administrative officers or bodies, who are required to investigate facts, or ascertain the existence of facts, hold hearings, and draw conclusions from them, as a basis for their official action, and to exercise discretion of a judicial nature." *Id.* at 496 (citations omitted). In *Remington,* this court, in determining whether a proceeding was quasi-judicial, was guided by whether the body exercised " 'such traditional judicial powers as the conducting of hearings at which witnesses may be summoned and examined, documents subpoenaed, and judgments handed down.' " *Remington,* 817 S.W.2d at 574, *quoting Annot., Libel and Slander: Privilege Applicable to Judicial Proceedings as Extending to Administrative Proceedings,* 45 A.L.R.2d 1296, 1298–99 (1956).

The grievance proceeding in question here was conducted before the Two-state Joint Committee, which was established pursuant to the collective bargaining agreement between UPS employees and UPS. The Committee consists of three management and three union representatives. Neither the body nor its functions are established or mandated pursuant to law. It is neither a public body with official duties nor does it render judgments or make decisions of a judicial nature. The Committee does not possess the power to subpoena witnesses or documents. Witnesses that come before the Committee are not required by law to be sworn before testifying and are not subject to perjury. There are no formal rules of evidence and no opportunity for cross-examination. The only record of the proceeding is

an unofficial tape recording. Applying the yardsticks of *McNary* and *Remington* to these facts, we hold that the hearing before the Committee does not qualify as a quasi-judicial proceeding and that statements published in the course thereof were not absolutely privileged.

In holding as we do as to this issue, we are mindful of the decisions cited to us by the Union from other jurisdictions, both federal and state, holding that union grievance proceedings are quasi-judicial in nature, according a union absolute immunity for statements made in the course thereof. However, these decisions are not based upon the considerations deemed by our appellate courts to be significant in determining the issue presented here, but are based upon a consideration of a federal labor policy encouraging settlement of labor disputes through nonjudicial means. See *Hull v. Central Transport, Inc.*, 628 F.Supp. 784, 788 (N.D.Ind.1986). The concern addressed by this policy is that the threat of state defamation actions will discourage frank and open discussion in union grievance proceedings hindering nonjudicial settlement. On balance, we believe that this concern can be adequately addressed by granting only qualified immunity, which unlike in the case of absolute immunity, would also protect individuals from malicious defamation. We believe the need to protect individuals from malicious defamation in union grievance proceedings is, at least, equal to and must be balanced against the federal labor policy of encouraging nonjudicial settlement of labor disputes.

■■■ In refusing to extend absolute immunity to the proceeding in question here, we find no danger in chilling the purposes of such proceedings. We find nothing onerous about requiring participants in these proceedings to refrain from publishing statements with "actual malice." In Missouri, "actual malice" in the publication of false and defamatory statements means "that the statements were made with knowledge that they were false or with reckless disregard for whether they were true or false at a time when defendant had serious doubts as to whether they were true." *Carter*, 714 S.W.2d at 512; *see also Smith*, 728 S.W.2d at

683. This was the definition for actual malice adopted by the Supreme Court of the United States in a first amendment libel case, *New York Times v. Sullivan*, 376 U.S. 254, 280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964). With this definition in mind, we find, as have state and federal courts in other jurisdictions, that open and frank discussion in union grievance proceedings can occur without the need to publish statements which are known to be false or with reckless disregard for their truthfulness. See *Thompson v. Public Serv. Co. of Colorado*, 800 P.2d 1299 (Colo.1990), *cert. denied*, 502 U.S. 973, 112 S.Ct. 452, 116 L.Ed.2d 469 (1991) ; *Pease v. International Union of Operating Eng'rs Local 150*, 208 Ill.App.3d 863, 153 Ill.Dec. 656, 666, 567 N.E.2d 614, 624 (Ill.App.2d 1991); *Krasinski v. United Parcel Serv.*, 124 Ill.2d 483, 125 Ill.Dec. 310, 530 N.E.2d 468, 470–74 (1988); *Bird v. Meadow Gold Prod. Corp.*, 60 Misc.2d 212, 302 N.Y.S.2d 701 (N.Y.Sup.Ct.1969).

■■■ Without the threat of perjury and in the absence of the factors previously deemed vital by the appellate courts of this state to confer absolute immunity, we are not willing to extend absolute immunity on policy reasons to union grievance proceedings like the one in question here. Thus, we find the trial court erred when it sustained the Union's motion for a directed verdict on the basis of absolute immunity. However, this error does not require reversal and remand if the trial court's grant of the motion was correct on an alternative basis, although not relied upon by the trial court. *Wilkerson*, 908 S.W.2d at 697.

The Union contends that an alternative basis for the trial court's ruling exists in that the publication in question was protected by a qualified privilege and that Wright did not present evidence sufficient to show actual malice to overcome this privilege. A determination as to whether the Union was entitled to qualified immunity was never made by the trial court. In the eyes of the trial court, this determination was rendered unnecessary when it found the Union was entitled to absolute immunity. Thus, we must decide whether the Union was entitled to qualified immunity; and if it was, we must

then decide whether Wright presented evidence legally sufficient to overcome this defense.

The burden is upon the defendant to convince the court that it is entitled to rely on the defense of qualified privilege. *Estes,* 437 S.W.2d at 691. On this issue, Wright does not appear to argue it, but does note in her brief that the Union did not specifically plead qualified immunity as an affirmative defense pursuant to Rule 55.08, but only absolute immunity. However, it is apparent from her brief that Wright's real complaint is that qualified immunity, not absolute, should have been applied by the trial court and that her evidence established actual malice sufficient to defeat this defense of immunity. In any event, we find that the Union's failure to plead specifically qualified privilege as a defense is of no significance under the circumstances here in that Wright was put on notice that the Union would rely on the defense of privilege. The fact the Union did not specifically plead both absolute and qualified privilege did not violate the spirit and intent of the Rule 55.08.

Having determined that the Union sufficiently pled the affirmative defense of qualified immunity, we must next decide whether it carried its burden to establish its entitlement to the defense. Although we have already found that the Two-state Joint Committee hearing does not rise to the level of a quasi-judicial proceeding entitling the Union to absolute immunity, we find it does rise to, at least, the level of a union activity encompassed by the holding in *Pulliam*. As a consequence, we find the Union sufficiently established its right to claim qualified immunity in the case at bar. Because Wright had the burden of proof to establish actual malice sufficient to overcome the Union's defense of qualified privilege, the question then becomes whether her evidence was sufficient as a matter of law to allow a reasonable jury to find actual malice, which would defeat the Union's defense of qualified immunity and allow the submission of her defamation claim to the jury.

In a defamation action, a qualified privilege can only be overcome with a showing of actual malice. *Carter,* 714 S.W.2d at 512; *Smith,* 728 S.W.2d at 683. As stated *supra,* in a defamation action, acting with "actual malice" in the publication of a statement means that the defendant acted with knowledge that the statement was false or with reckless disregard for whether it was true or false at a time when defendant had serious doubts as to whether it was true. *Carter,* 714 S.W.2d at 512; *Smith,* 728 S.W.2d at 683. "[A]ctual malice does not mean ... that defendant was actuated by spite, ill will and a purpose to injure the plaintiff." *Smith,* 728 S.W.2d at 683. "The rule is recognized in Missouri as well as elsewhere that the existence of a conditional or qualified privilege precludes an inference of malice from the communication of false and defamatory matter and the plaintiff has the burden of proving express malice." *Pulliam,* 406 S.W.2d at 641 (citations omitted). "[T]he burden of proving 'actual malice' requires the plaintiff to demonstrate with clear and convincing evidence that the defendant realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement." *Carmichael v. Wiesemann,* 738 S.W.2d 877, 881 (Mo.App. 1987). Applying these rules and reviewing Wright's evidence in a light most favorable to her and giving her the benefit of all reasonable inferences while disregarding the Union's evidence except as it aids Wright's case, we must determine whether there was substantial evidence from which a reasonable juror could have found actual malice by the Union in the publication of the statements in question which would have defeated its defense of qualified immunity and allowed Wright to survive the Union's motion for directed verdict at the close of her evidence. However, in our review, "we can neither supply evidence nor ignore evidence binding on [Wright], nor can we use [our standard of review] as a basis for unreasonable, speculative or forced inferences." *Adler v. Laclede Gas Co.,* 414 S.W.2d 304, 306 (Mo. banc 1967) (citations omitted) (emphasis added).

Because there is no direct evidence that the Union or its agents solicited the statements or encouraged union members to make them and that the Union or its agents knew the statements were false, Wright is

forced to rely upon circumstantial evidence and the reasonable inferences drawn therefrom to carry her burden to establish actual malice. Wright contends that from the evidence presented a reasonable jury could logically infer that the Union knew of the falsity of the statements published at the hearing or that it acted with reckless disregard as to their truth or falsity. We disagree.

 "An inference is a logical a priori conclusion drawn by reason from proven or admitted facts. It is more than, and cannot be predicated on, mere surmise or conjecture. It is not a possibility that a thing could have happened or an idea founded on the probability that a thing may have occurred. *Smith v. Seven–Eleven, Inc.,* 430 S.W.2d 764, 769 (Mo.App.1968)." *Allison v. Sverdrup & Parcel & Assoc., Inc.,* 738 S.W.2d 440, 456 (Mo.App.1987). "We liberally view the legitimacy of inferences in the plaintiff's favor," however, such "liberal view does not include speculative free leaps to the desired inference." *Heacox v. Robbins Educ. Tours, Inc.,* 829 S.W.2d 600, 603 (Mo.App.1992). " 'If two or more inferences may be deducted of equal reasonableness, then there is no inference that may be indulged without mere speculation.' " *Pipes v. Missouri Pac. R.R. Co.,* 338 S.W.2d 30, 36 (Mo. banc.1960), *citing Pape v. Aetna Casualty & Sur. Co.,* 150 S.W.2d 569, 573 (Mo.App.1941). "[P]roof of essential facts may be accomplished by circumstantial evidence so long as the desired inference is established 'with such certainty as to cause it to be the more probable of the conclusions to be drawn.' " *Landis v. Sumner Mfg.Co., Inc.,* 750 S.W.2d 466, 469 (Mo.App.1988), *citing Vaughan v. Taft Broadcasting Co.,* 708 S.W.2d 656, 661 (Mo. banc 1986). "Liability cannot rest upon guesswork, conjecture, or speculation *beyond* inferences that can reasonably be drawn from the evidence. Sheridan v. Sunset Pools of St. Louis, Inc., 750 S.W.2d 639, 641 (Mo.App.1988)." *Garrett v. Overland Garage & Parts, Inc.,* 882 S.W.2d 188, 191 (Mo.App.1994) (emphasis supplied).

In support of her allegation of actual malice, Wright summarizes in her brief the evidence on which she relies. She first argues that a reasonable juror could infer malice by the Union from the fact the union steward, Mario Rojas, "threatened" her that if she pursued her sexual harassment complaint against Dorner that there were union members who were upset and prepared to state that she had made a comment that she wanted to grab a man's crotch.[1] A statement made by a union member as to this alleged comment by Wright was introduced on Dorner's behalf at the Two-state Joint Committee hearing concerning Dorner's termination. Wright's testimony at trial on this issue, which was the most favorable to her claim of malice, is as follows:

> Q. Serita, before we broke, I was asking you about the conversation you had with Mario Rojas. You went up to Mr. Rojas to have, start a conversation and were relating that. Could you please go back and tell the jurors again about this conversation, what was said?
>
> A. Yes. I approached Mr. Rojas and asked him for a grievance form.
>
> MR. WALSH: I'm sorry?
>
> MR. GOLDBERG: Could you please speak up a little bit so that all—everybody here can hear you?
>
> A. Yes sir. I'm a little anxious this morning, I apologize. Yes sir, I approached Mr. Rojas and asked him for a grievance form.
>
> Q. What happened?
>
> A. He asked me, "Is this about Dale [Dorner]?" And I said, "Yes, it is."
>
> Q. What happened next?
>
> A. He said, "You can't file a grievance." And I said, "Why can't I file a grievance?" And he says, "Well, you can't— you just can't, let me talk to you." And he pulled me over to the side between some trucks and he says, "I told you I'll handle it. You can't file a grievance."

1. Because Rojas is neither an employee of the Union nor appointed a union steward by the Union, but rather, is an employee of and paid by UPS and is elected a union steward by fellow UPS employees and union members, there is some question whether he was an agent of the Union acting on its behalf when he made the "threat" alleged. However, the record indicates that the parties stipulated to the fact that his actions were the actions of the Union for purposes of this lawsuit.

And I said, "I want to file a grievance." And he says, "No, no, let me talk to you." He said, "You've already pissed a bunch of guys off over what's going on now." He says, "I've got—I've got some guys that are going to say that when a male driver grabbed his penis and said you asked could you grab it, too." And I screamed at him.

Tr. 606–07. Wright also points to alleged animosity towards her by the Union and the declarants, evinced by the Union's alleged refusal to provide her a grievance form and statements made by the declarants to Rojas, as evidence from which malice could be inferred. As further evidence of malice, she points to evidence that the Union did not investigate the statements made by the union members before publishing them, even though it was aware that Dorner was a liar.

We will first deal with Rojas' alleged threat to Wright. Wright contends that it can be inferred that Rojas' statements to her constituted a threat of obtaining *false* statements from union members if she pursued her claim of sexual harassment and that the statements of the union members were published by the Union in retaliation against her for ignoring Rojas' threat and pursuing her sexual harassment complaint against Dorner. The first problem with this argument is that it was the Union's business agent, Harold McLaughlin, not Rojas, who published the statements at the hearing. There is no evidence from which it can be reasonably inferred that Rojas published the statements in question. Thus, unless there is evidence to show what Rojas said and did as to the alleged "threat" was known to McLaughlin, it is illogical and unreasonable to argue that Rojas' conversation with Wright was substantial evidence that the publication by McLaughlin as agent for the Union was done with actual malice. From a review of the record, we find no evidence from which this could be reasonably inferred.

Even assuming that Wright could get over this hurdle, others exist. The evidence, including Wright's, was that Dorner, and Dorner alone, solicited the statements from the Union members. The record is void of any evidence from which it could be reasonably inferred that the Union's agents solicited or in any way encouraged the making of the statements. Thus, it is arguable that the only reasonable inference from this evidence is that Rojas was not threatening Wright in an attempt to dissuade her from proceeding, but was warning her regarding the consequences of her actions, including the disclosure of unflattering allegations by fellow union members, should she choose to proceed with her complaint. However, even assuming, *arguendo*, that his conversation with her was more than a mere warning of what would occur if she persisted with her complaint, and that it was, in fact, a threat communicated to her to induce her to drop her complaint, it is still not reasonable to further infer that Rojas knew the statements by the union members were false or that he was reckless as to whether they were true or false. From this evidence, it is unreasonable to infer one way or the other as to what Rojas' belief was as to the truthfulness of the statements in question or that he should have had serious doubts as to their accuracy. To engage in such an inference would be speculation at best. Certainly, such evidence would not give rise to an inference that would constitute clear, cogent and convincing evidence of actual malice by the Union in the publication of the statements in question.

 Wright also argues that actual malice can be inferred from the fact that there was no valid reason to publish the statements except to retaliate against her for ignoring Rojas' alleged threat and that the Union was simply picking sides when it chose to represent Dorner and in the process chose to sacrifice her good reputation. This argument ignores the fact that there is a reasonable explanation for publication of the statements by the Union. The statements were relevant to a defense the Union was presenting on Dorner's behalf—that his alleged comments to Wright were not sexually harassing because they were not unwelcome by Wright. *See Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 68, 106 S.Ct. 2399, 2406, 91 L.Ed.2d 49 (1986) (holding that actions and comments are not sexually harassing unless they are unwelcome; actions and comments of plaintiff are relevant in determining whether ac-

tions and comments of defendant are unwelcome); *see also Moylan v. Maries County*, 792 F.2d 746, 749 (8th Cir.1986); *Hall v. Gus Constr. Co., Inc.*, 842 F.2d 1010, 1013 (8th Cir.1988) (citing *Moylan*). Under its collective bargaining agreement the Union had a duty to fairly and impartially represent Dorner and was free to make a choice between the competing interests of Dorner and Wright at the hearing as long as it acted in good faith, or in other words, acted without malice. *See Martin v. Local 1513 and Dist. 118 of the International Ass'n of Machinists & Aerospace Workers*, 859 F.2d 581, 584 (8th Cir.1988) (quoting from *Farmer v. ARA Serv., Inc.*, 660 F.2d 1096, 1103–04 [6th Cir. 1991], a union breaches its duty of fair representation when it "fails to fairly and impartially represent all members of a bargaining unit" and its "conduct toward any member becomes arbitrary, discriminatory or in bad faith."); *Humphrey v. Moore*, 375 U.S. 335, 350, 84 S.Ct. 363, 372, 11 L.Ed.2d 370 (1964) (holding that labor unions can choose between competing interests of members as long as they act in good faith); *see also Carter*, 714 S.W.2d at 514 (holding that "good faith" goes to a determination of malice). Thus, contrary to Wright's claim that the publication of the statements by the Union was done only for retaliatory purposes, the publication in question had a relevant and permissible purpose. Given this fact, the inference for which Wright argues would at best require speculation and certainly would not constitute clear, cogent and convincing evidence of actual malice by the Union.

■ Wright next argues that the Union's animosity and its knowledge of the animosity of the declarants toward her, as evinced by the Union's alleged refusal to provide her with a grievance form and Rojas' conversation with her, is evidence of the Union's actual malice in publishing the statements. We would agree that this may be some evidence of a motive to make false statements. However, proof "that defendant was actuated by spite, ill will and a purpose to injure the plaintiff" does not establish actual malice. *Smith*, 728 S.W.2d at 683. Without additional evidence, evidence of animosity does not establish actual malice. *Id.* at 683. This additional evidence is lacking here.

■ Wright also argues that a failure to investigate by the Union before publishing the statements, in light of the fact Dorner was a known liar, is evidence of actual malice. The United States Supreme Court has held that "mere proof of failure to investigate, without more, cannot establish reckless disregard for the truth. Rather, the publisher must act with a 'high degree of awareness of ... probable falsity.'" *(citations omitted)*. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 332, 94 S.Ct. 2997, 3003, 41 L.Ed.2d 789 (1974). "'[S]ubjective awareness of probable falsity,' *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 335 n. 6, 94 S.Ct. 2997, 3004, 41 L.Ed.2d 789 (1974), may be found if 'there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.' *St. Amant v. Thompson*, 390 U.S. 727, 732, 88 S.Ct.1323, 1326, 20 L.Ed.2d 262." *Herbert v. Lando*, 441 U.S. 153, 156–57, 99 S.Ct. 1635, 1639, 60 L.Ed.2d 115 (1979). Here, the statements in question were not statements of Dorner, but of other union members. There is nothing in the record to indicate the declarants were known to the Union to be liars. And, although in Wright's eyes the information alleged about her was so obviously false as to put the Union on notice of its falsity, we cannot agree that this is a reasonable inference from the evidence stripped of her personal knowledge. She fails to point to anything in the record that would support an inference that the statements were so obviously false that the Union would have been immediately put on notice of their falsity and the need to investigate their veracity before publishing.

In summary, we find that in order to carry her burden to show actual malice and make a submissible case as to her defamation claim, Wright was forced to rely on unreasonable, forced, and impermissible inferences, as well as inference stacking, requiring a reasonable jury to engage in speculation and conjecture. The plaintiff "bears the burden to remove its case 'from mere conjecture and to establish [its] case by substantial evidence having probative value or by reasonable inferences which can be drawn from [its] evidence[,]' *Gordon v. Oidtman*, 692 S.W.2d 349, 352

(Mo.App.1985)[,]"State ex. rel *Missouri Highway & Transp. Com'n v. Keeley,* 780 S.W.2d 84, 87 (Mo.App.1989), which Wright has failed to do in this case. We find that Wright did not present substantial evidence from which a reasonable jury could find actual malice by the Union in publishing the statements alleged to be false and defamatory, without which she could not defeat the Union's defense of qualified immunity. Because she could not defeat the Union's defense of qualified immunity, she did not make a submissible case of defamation against the Union. Thus, although the trial court in ruling as it did relied upon an incorrect basis, it was, nonetheless, correct in sustaining the Union's motion for directed verdict at the close of plaintiff's evidence. *See Wilkerson,* 908 S.W.2d at 697 (appellate court must affirm where ruling on motion is correct, but basis incorrect).

Point denied.

Wright's Points II through IV assign error as to the damages awarded in conjunction with her sexual harassment claim. Logically, before we address the merits of these claims, we must first determine the merits of the Union's claim in its Point IV that the trial court erred in failing to sustain its motion for directed verdict or in the alternative for JNOV on Wright's claim of sexual harassment. If we find the trial court should have sustained the Union's motion for directed verdict or for JNOV, it would be unnecessary to address Wright's three remaining claims in that they would be moot.

### *The Union's Cross–Appeal*

**II. Failure to Grant the Union's Motion for a Directed Verdict or Motion for Judgment NOV as to Wright's Claim of Sexual Harassment**

In Point IV of its brief, the Union contends that the trial court erred in failing to grant its motion for a directed verdict or to enter judgment notwithstanding the verdict, JNOV, as to Wright's claim for sexual harassment. The Union argues that Wright failed to present sufficient evidence to make a submissible case of sexual harassment under Title VII of the Civil Rights Act of 1964, as amended, in that there was no evidence from which a reasonable juror could conclude that the Union breached any duty owed to her as imposed by Title VII. We agree.

### A. Standard of Review

In deciding whether [Wright] made a submissible case against the [Union] and whether a motion for directed verdict or for judgment notwithstanding the verdict should have been granted, [this court] reviews the evidence from a viewpoint most favorable to [Wright] and gives [her] the benefit of every reasonable inference which the evidence tends to support, disregarding all contrary evidence. Under this standard, a jury verdict will not be overturned unless there is a complete absence of probative facts to support the verdict. (citations omitted). "A case should not be withdrawn from the jury unless the facts in evidence and the inferences fairly deductible therefrom are so strongly against plaintiffs as to leave no room for reasonable minds to differ." *Bridgeforth v. Proffitt,* 490 S.W.2d 416, 423 (Mo.App.1973). *Blake v. Irwin,* 913 S.W.2d 923, 928 (Mo.App. 1996).

### B. Discussion

■ As a basis for her hostile-work-environment sexual-harassment claim against the Union, Wright did not specifically plead a violation of Title VII of the Civil Rights Act of 1964, § 701 *et seq.,* as amended, 42 U.S.C. § 2000e *et seq.* However, in her brief she concedes that her claim is one of sexual harassment under Title VII and was submitted to the jury in her verdict director, Instruction No. 5, on this theory.[2] In this

2. Instruction No. 5 reads as follows:
 Your verdict must be for plaintiff Serita Wright and against defendant Teamsters Local 41 on her claim of sexual harassment if you believe:
 First, plaintiff was subjected to sexual harassment, and

 Second, such harassment was based on sex, and
 Third, defendant Teamsters Local 41 knew or should have known of the sexual harassment and failed to take remedial action, and

respect, although neither party raised the issue, we note it is permissible to litigate Title VII claims in state court. *Berkowski v. St. Louis County Bd. of Election Comm'rs,* 854 S.W.2d 819, 824 (Mo.App.1993); *Woods v. Missouri Dep't. of Corrections,* 806 S.W.2d 761 (Mo.App.1991). Even though Title VII cases can be brought in state court, there is a dearth of state case law as to hostile-work-environment sexual-harassment claims in Missouri based on Title VII. Thus, we are forced to look for authority to federal decisions where such claims are routinely brought. *See Wentz,* 847 S.W.2d at 879 (recognizing that in employment discrimination actions, Missouri courts have adopted Title VII federal case law as authoritative where not in conflict with state case law).

In response to the Union's claim that she did not make a submissible case of sexual harassment against it on any factual basis, Wright argues in her brief that the record supports a submissible case in that the Union sexually harassed her by: 1) refusing to file a grievance concerning Dorner's sexual harassment of her seeking his termination as she requested, and by interfering with the disciplining by UPS of Dorner for sexual harassment by opposing his termination at the Two-state Joint Committee hearing; and, 2) by retaliating against her for pursuing her sexual harassment complaint against Dorner by knowingly obtaining and using false and defamatory statements about her at the hearing. We will deal with each basis separately, with the first basis designated as "Union Representation" and the second as "Retaliation."

Before we deal with the alleged bases for Wright's claim, we must first resolve the issue of agency raised by the Union as to its responsibility for Dorner's actions in sexually harassing Wright. There seems to be some confusion by the Union as to whose actions on which Wright is predicating liability. In its brief, the Union argues that it is

not vicariously liable under Title VII for Dorner's actions, just like his employer would not be. We agree with the Union that an employer's liability for sexual harassment under Title VII is not based on an application of respondeat superior. *Hall,* 842 F.2d at 1015. Rather, under Title VII an employer will only be liable for sexual harassment by one employee of another if the employer knew or should have known of the harassment and failed to take prompt remedial action reasonably calculated to end the harassment. *Davis v. Tri–State Mack Distrib., Inc.,* 981 F.2d 340, 343 (8th Cir.1992). Likewise, under Title VII, a union is not vicariously liable for prohibited discriminatory acts by an employer or employee in the workplace. *Goodman v. Lukens Steel Co.,* 777 F.2d 113, 127 (3rd Cir.1985), *aff'd,* 482 U.S. 656, 664–68, 107 S.Ct. 2617, 2623–24, 96 L.Ed.2d 572 (1987); *Romero v. Union Pac. R.R.,* 615 F.2d 1303, 1310–11 (10th Cir.1980); *Anspach v. Tomkins Indust., Inc.,* 817 F.Supp. 1499, 1517 (D.Kan.1993), *aff'd, Anspach v. Sheet Metal Workers' Ass'n Local No. 2,* 51 F.3d 285 (10th Cir.1995). However, a union does have an affirmative duty to insure compliance with Title VII, the breach of which gives rise to a union's Title VII liability. *Goodman,* 482 U.S. at 664–68, 107 S.Ct. at 2623–24. A union is only responsible for its own actions in failing to oppose the sexual harassment once it has notice of it. *Id.; Romero,* 615 F.2d at 1310–11; *Anspach,* 817 F.Supp. at 1517.

Here, Wright is not basing liability on Dorner's actions, but on the alleged actions of Rojas and McLaughlin in response to her sexual harassment complaint against Dorner. Wright is contending that their actions in response to her complaint against Dorner were discriminatory in nature and violative of Title VII. The record reflects that Rojas and McLaughlin were stipulated to by the parties as agents for the Union for purposes of this lawsuit. The record also reflects that in

---

Fourth, as a result of such failure to take remedial action, plaintiff Serita Wright sustained damages.

The phrase "sexual harassment" as used in this instruction means that a person is subjected to a work environment where conditions existed that were so severe that a reasonable person

would find the conditions to be a sexually hostile or offensive work environment.

Not in M.A.I., M.A.I. 33.01 [1991 Revision] Harris v. Forklift Systems, Inc., 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) Submitted by plaintiff. L.F. 54.

processing Wright's complaint against Dorner they were acting within their scope of their authority as union agents. Thus, the issue for us to decide is whether Rojas' and McLaughlin's alleged actions, as agents for the Union, constituted unlawful discrimination and were violative of Title VII as alleged by Wright.

### 1. Union Representation

Initially we must address the Union's argument that Wright's hostile-work-environment sexual-harassment claim for refused union representation could not be maintained as a Title VII action. The Union reasons that the exclusive theory of recovery for Wright's claim of sexual harassment against the Union, based on the alleged acts of refused union representation in response to her sexual harassment complaint against Dorner, was one for breach of the Union's duty of fair representation and could not be brought as a separate Title VII action. Wright did plead in her petition a separate claim of "Breach of Duty of Fair Representation," which was dismissed at trial. Wright counters the Union's argument with her contention that an action for breach of duty of fair union representation is not the exclusive theory of recovery for her claim of sexual harassment as alleged. She contends that based on the alleged acts of the Union's agents of which she complains, she could also maintain a separate action of sexual harassment under Title VII, and that her claim was presented to the jury, not as a breach of fair union representation, but as a violation of Title VII. Wright also points out that Title VII discrimination on the basis of sex encompasses claims of sexual harassment, although the conduct complained of, as here, is not sexual in nature. *Hall,* 842 F.2d at 1014.

We agree with Wright that she could bring a separate Title VII hostile-work-environment sexual-harassment action against the Union for the acts alleged. There is nothing mutually exclusive about a breach of a union's duty of fair representation and a Title VII claim. *See Farmer,* 660 F.2d at 1104 (holding that "it is almost axiomatic that a union's breach of the duty of fair representation also subjects it to liability under Title VII if the breach can be shown to be because of the complainant's race, color, religion, sex, or national origin"). The United States Court of Appeals for the Eighth Circuit has expressly recognized the existence of a Title VII action against a union for a breach of its duty of fair representation. *See Carter v. United Food & Commercial Workers, Local No. 789,* 963 F.2d 1078, 1082 (8th Cir.1992); *Martin,* 859 F.2d at 584. In interpreting Title VII as it pertains to the unlawful employment practices of labor organizations, specifically 42 U.S.C. § 2000e2(c), and the intentional refusal to represent a union member on a grievance, as alleged by Wright here, our federal appellate courts have held that such actions violate the act.[3] *See Goodman, supra; United Food & Commercial Workers,* 963 F.2d at 1082; *Marquart v. Lodge 837, International Ass'n of Machinists & Aerospace Workers,* 26 F.3d 842 (8th Cir.1994); *Martin,* 859 F.2d at 584. With the foregoing as a backdrop, we must determine whether, under the law and facts of this case, Wright made a submissible case of Title VII sexual harassment against the Union.

To establish a prima facie Title VII case against a union based on a failure or refusal to represent a union member, such as Wright alleges here, the plaintiff must show that the union breached its duty to represent him or her, and that the breach was motivated by the complainant's race, color, religion, sex, or national origin. *United Food & Commercial Workers,* 963 F.2d at 1082, *citing Martin,* 859 F.2d at 584. "The duty of fair representation is a judicially created duty arising out of the statutory grant of exclusive

---

3. Title VII, as it relates to the unlawful employment practices of labor organizations, provides in pertinent part as follows:

 **(c) Labor organization practices**
It shall be an unlawful employment practice for a labor organization—
 (1) to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin;
 . . . .
 (3) to cause or attempt to cause an employer to discriminate against an individual in violation of this section.
42 U.S.C. § 2000e–2(c).

representation to unions under the Railway Labor Act, (citations omitted), and the National Labor Relations Act, *Ford Motor Co. v. Huffman,* 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953)." *Woods v. Graphic Communications,* 925 F.2d, 1195, 1203 (9th Cir. 1991). In *Martin,* quoting from *Farmer, supra,* the court recognized that a union breaches its duty of fair representation when it "fails to fairly and impartially represent all members of a bargaining unit" and its "conduct toward any member becomes arbitrary, discriminatory or in bad faith." *Martin,* 859 F.2d at 584.

█ In this case, the alleged breach of the Union's duty is its refusal to file a grievance on Wright's behalf and for opposing Dorner's termination at the Two-state Joint Committee hearing contrary to Wright's interests. To determine whether these actions constituted a breach of the Union's Title VII duty owed to Wright, it is necessary to examine the nature of Wright's sexual harassment complaint against Dorner and how it was handled by the Union's agents, Rojas and McLaughlin, in comparison to the requirements of Title VII.

█ As we discussed *supra,* a union's Title VII liability for failed or refused representation is not based on *respondeat superior,* but rather on the failure of the union, once it becomes aware of discrimination, to take adequate and reasonable steps to end the complained-of discrimination, in this case the sexual harassment of Wright by Dorner. Although not alleged here, this would also include the failure or refusal of a union to prevent discrimination by an employer. Thus, a union will not be liable under Title VII for the past sexual harassment of one union member by another, but only for the future harassment which it failed to take steps reasonably calculated to end once it had notice of the harassment. In this respect, because a union cannot directly discipline, terminate or otherwise control what union employees do in the workplace, one of its primary weapons in combating such sexual harassment is to take its members' complaints, pursuant to the collective bargaining agreement, to management which can. This may or may not necessitate the filing of a

formal grievance depending on the circumstances. Thus, it was logical for our federal courts to conclude that a refusal by union agents on the basis of race, color, religion, sex or national origin to exercise their authority under the collective bargaining agreement to initiate grievance proceedings when *necessary* to prevent further discrimination in the workplace would result in Title VII liability. With this as a given, one of the critical issues then in determining whether a union will be held liable under Title VII for refusing to represent a union member on a grievance is whether the grievance was necessary to remedy the complained-of discrimination.

In order to determine the necessity of filing a grievance, it is important to understand certain aspects of the grievance process. Grievances are disputes or complaints between employees and the company. Under the collective bargaining agreement, union members do not technically "file" their grievances with company management. Although here the Union routinely made grievance forms available to its members, grievances were, in fact, filed with management by the Union on behalf of their members. Under the agreement, the Union employees took their complaints that they wanted addressed by management to the Union—it was then up to the Union, not the employee, whether a complaint warranted the filing of a formal grievance with management. Some disputes are worked out informally without the necessity of filing a formal grievance. Grievances are not filed against fellow employees and union members. Grievances are directed at and to management to take the appropriate action to resolve the disputes. This is logical in that, as we discussed *supra,* it is company management, not the union, that has the ultimate and actual authority to discipline in the workplace.

From Wright's assertions, we can glean that she equates the Union's refusal to file a grievance and its opposition to Dorner's termination with a refusal to represent her on her sexual harassment complaint. She automatically assumes that in this refusal, the Union did not take the necessary remedial steps reasonably calculated to end Dorner's

sexual harassment of her. By her argument, she would ignore as irrelevant to any determination of the Union's breach of its duty the issue of whether her complaint against Dorner could have been resolved without resorting to a formal grievance proceeding resulting in his termination. Assuming that Dorner's alleged sexual harassment would have ceased without the need of resorting to a formal grievance proceeding resulting in his termination, then logically, the Union's failure or refusal to do that which was not necessary to protect her from further sexual harassment by Dorner could not be considered to be a breach of its duty to fairly and impartially represent Wright on her complaint.

As the Union contends, Wright's claim of refused union representation in response to her complaint of sexual harassment by Dorner labors under an incorrect assumption that because she requested it, she had an absolute right to have a grievance filed and to have the Union pursue, on her behalf, Dorner's termination. As we know, from our reading of the cases, Title VII liability, as it relates to responding to complaints of employees and union members concerning sexual harassment between them, is predicated on the employer's or union's failure to combat the sexual harassment once it becomes aware of it. We find no authority for the proposition that in order to avoid violating Title VII, a union, once it becomes aware of sexual harassment between employees and union members, is required to immediately file a formal grievance and seek to have the offending employee and union member terminated, if requested. To do so would require unions to process even meritless grievances, which is not required. *Galindo v. Stoody Co.,* 793 F.2d 1502, 1513 (9th Cir. 1986). Further, a union is "not required to represent each member of the bargaining unit to his or her complete satisfaction on every grievance." *Farmer,* 660 F.2d at 1103. What is required of an employer and union under Title VII in response to employee union members' sexual harassment complaints against fellow employee union members, as alleged here, is prompt "remedial action which is reasonably calculated to end the harassment." *Kopp v. Samaritan*

*Health Sys., Inc.,* 13 F.3d 264, 269 (8th Cir. 1993).

With respect to a union's Title VII duty in response to sexual harassment complaints between union members, as stated by the court in *Baskerville v. Culligan Int'l Co.,* 50 F.3d 428, 432 (7th Cir.1995): "[T]he criterion for when an employer is liable for sexual harassment is negligence, just as under the old common law of industrial accidents (citations omitted). The employer's legal duty is thus discharged if it takes reasonable steps to discover and rectify acts of sexual harassment of its employees." *Id.* at 432. And, as stated in *Spicer v. Virginia,* 66 F.3d 705 (4th Cir.1995):

> "The work place is a complex and diversified community in which employees work closely and continuously in each other's presence over long hours, during which, experience has shown, inappropriate conduct occurs from time to time. While employers can and should be required to adopt reasonable policies aimed at preventing illegal conduct and to take reasonable measures to enforce these policies, they cannot be held to a standard under which they are liable for any and all inappropriate conduct of their employees. When presented with the existence of illegal conduct, employers can be required to respond promptly and effectively, but *when an employer's remedial response results in the cessation of the complained of conduct, liability must cease as well.* Employers cannot be saddled with the insurmountable task of conforming all employee conduct at all times to the dictates of Title VII, irrespective of their knowledge of such conduct or the remedial measures taken in response to such conduct."

*Id.* at 711 (emphasis added). This liability is consistent with the reason Wright went to the Union in the first place and requested it to address her sexual harassment complaint against Dorner. She was seeking to end his sexual harassment of her. At that juncture, as to the Union, Wright was not entitled under Title VII to have the Union "punish" Dorner for his conduct. Under Title VII she was only entitled from the Union to have it

do whatever was within its power to end the sexual harassment. Thus, the refusal to file a grievance is significant to a determination of Title VII liability only in the context of whether it was a necessary remedial action which would have ended the complained-of unlawful sexual harassment. It is in this context that the Union's actions through its agents must be judged in determining whether there was a breach of its duty to combat discrimination in the workplace under Title VII. The issue then for us to decide is whether the sexual harassment of Wright by Dorner ceased after Wright complained to the Union, and if it did not, whether the Union's refusal to pursue the grievance on her behalf and its opposition to Dorner's termination resulted in his continued sexual harassment of her.

Wright admitted in her testimony that at her first meeting with Rojas, when she advised him of her complaint, he assured her he would take steps to insure that Dorner did not bother her again. She also admitted that at this time she did not demand a grievance form or that a grievance be filed. It was the next day and only after she had talked with some fellow female union members, who advised her of their belief that in order for her complaint to be addressed it was necessary for a grievance to be filed, that she felt the filing of a grievance was necessary and demanded from Rojas a form and that a grievance be filed. In her testimony, she alluded to what she believed was a mishandling of a previous complaint of another female union employee against Dorner as the impetus for her requesting a formal grievance be filed. Although this evidence of a previous complaint might be evidence of why Wright requested a grievance be filed, the mishandling of a grievance of another member, if it occurred, does not establish that the Union unfairly represented Wright on her complaint. *Martin*, 859 F.2d at 585.

Wright's testimony sheds a great deal of light on the issue of the necessity of filing a grievance to protect her from further sexual harassment by Dorner. On this issue, Wright testified in pertinent part as follows:

Q. Okay. And then you—did Mario [Rojas] meet with you then?

A. Yes sir, he did.

Q. And, did you discuss Dale Dorner?

A. Yes sir, we did.

Q. Did you discuss anybody else other than Dale or was this about Dale?

A. No sir, it was about Dale.

Q. And, do I understand this was then the following Monday after you had spoke to Jerry Ferguson?

A. Yes sir.

Q. And, did Mario assist you or did you believe he was going to assist you in that?

A. Yes sir, I did.

**Q. Okay. And, what was it your understanding was going to happen?**

**A. That he would proceed with Dale Dorner and be sure that the events that were taking place did not continue.**

Q. *And that, you felt that that would be adequate?* Well let me—let me strike that, let me ask you. Did you know when you spoke to Mario, exactly what it was you wanted? Or, did you just—or were you relating the events to him to explore your—

A. I was relating the events to him, so that he would be aware what was taking place, because he was actually my Union Steward.

Q. And, you were exploring solutions at that time?

A. Yes sir, I was.

Q. Now, after you spoke to Mario, that occasion, what did you do after that in relationship to all these events about Dale Dorner?

A. In—I had never been involved in a union before, so I didn't really understand all of the procedures and how you did everything and some of the women drivers explained to me the steps that I had to go through to file a grievance. And the next morning, I went to Mario Rojas, my Union Steward, and asked him for a grievance form.

Q. Let me ask you, when you asked *him* for a grievance form, what—what

were you going to do with the grievance form?

A. I told him the purpose of the grievance form was to file a formal grievance against Dale Dorner, to be sure that the Union heard and acted upon the situation that had occurred with me and Dale Dorner.

Q. And why had you decided, did you have to file a grievance?

A. No sir, I did not.

Q. But, you had decided to file one?

A. Yes sir, I did.

Q. Would you tell the jurors why?

A. Because in the course—I was not the first.

Q. You believed you weren't the first?

A. No sir, I was not.

Q. And, you wanted—so you wanted to do something about it?

A. Yes sir, I did.

Q. When you went to Mario and you asked him for the grievance form, what happened?

A. He told me—he asked me what the grievance form was for and I told him. He said, "Is this about Dale?" And I said, "Yes." And he said, "You can't file a grievance—I'll handle it." And I said, "I want to file a grievance because I want this heard." He said, "Come over here and let me talk to you."

Q. Now, stop for one moment. Did this take place at United Parcel Service?

A. Yes sir, it did.

Q. The day before you had had a conversation?

A. Yes sir.

Tr. 598–600 (emphasis added). After further questioning and a break, Wright's attorney returned to Wright's conversation with Rojas.

Q. What happened next?

A. He said, "You can't file a grievance." And I said, "Why can't I file a grievance?" And he says, "Well you can't—you just can't, let me talk to you." And he pulled me over to the side between some trucks and he says,

"I told you I'll handle it. You can't file a grievance." And I said, "I want to file a grievance." And he says, "No, no, let me talk to you." He said, "You've already pissed a bunch of guys off over what's going on now." He says, "I've got—I've got some guys that are going to say that when a male driver grabbed his penis and said you asked could you grab it, too." And I screamed at him.

Q. And when you screamed at him, how did he respond?

A. He acted like he wanted to touch me but he was afraid to. He put his hands up and he said, "Wait a minute, wait a minute, calm down." And he was looking around to see what attention was being drawn to me screaming at him. And I told him, "Do not touch me, don't touch me." And he said, "Calm down, calm down, let me talk to you." And I said, "I pay the same dues as these guys do and I have the same right to file a grievance and you can't tell me I can't file a grievance." And he said, "Just calm down." And I walked away from him very abruptly.

Tr. 606–07.

From Wright's own testimony, we know that immediately after her conversation with Rojas on June 9, 1992, she met with three members of management, Keith Tuttle, Marcus D'Leon, and William Powers, during which she received a blank grievance form from Tuttle. Wright used the form she obtained from Tuttle to file with management a grievance alleging sexual harassment by Dorner. Her grievance was accompanied by her supporting statement of the events that took place. This grievance was given by Wright to management sometime after June 9 and before June 15, 1992, which was the date of the local hearing on Dorner's termination by UPS. In regard to the filing of her grievance, Wright testified as follows:

Q. Okay, was your grievance submitted then, unsigned by the Union?

A. Yes sir, it was. I was told where another—

Q. Well, let me ask you this. Do you know that as a result of your initial grievance what the outcome for Dale Dorner was? Was there a, were you informed whether any action was taken by the company in response to your grievance?

A. By the Company, yes. By the Union, no.

Q. Let's talk about the Company. What did the Company do?

A. The Company initiated an investigation.

Q. Did Dale keep his job?

A. No sir, he did not.

Q. How do you know that?

A. Because he was terminated.

Q. And, how would you have known he was terminated, word-of-mouth—

A. Yes.

Tr. 621–22.

From Wright's testimony, we also know that immediately after she was denied a grievance form by Rojas, UPS management was in contact with her about Dorner's harassment and that she knew management was sympathetic to her cause and was going to look into her complaint. Immediately after her conversation with management and the filing of her grievance, management commenced an investigation of her complaint, resulting in Dorner's immediate termination. Dorner's termination occurred after June 9, but before June 15, which means the whole process of Wright's grievance being filed by her, UPS' investigation, and Dorner's termination took less than six days, during which there was no harassment by Dorner. In fact, from the time she made her complaint known to the Union until the time she left the employ of UPS, the evidence is uncontroverted that there were no further incidents of sexual harassment of Wright by Dorner.

It could be argued that it was the remedial action of UPS that ended the harassment and that the Union should not benefit from someone else's actions to avoid Title VII liability for alleged refused union representation. However, this argument ignores the basis for the Union's Title VII liability in this case and that is whether the sexual harassment of Wright by Dorner ceased after the Union was put on notice. Without a showing that she was subjected to further sexual harassment because of the Union's refusal to represent her, Wright is unable to demonstrate a breach of the Union's Title VII duty exposing it to liability. This argument also ignores the fact that the Union's approach of attempting to end the sexual harassment without resorting to the formal grievance process and seeking Dorner's termination was never given a reasonable opportunity to succeed. From the evidence, we know that less than 24 hours after being told by Rojas that he would do whatever was necessary to insure she was not further harassed by Dorner, Wright demanded a grievance be filed seeking his termination. We also know from Wright's testimony that when the Union refused to file a formal grievance seeking Dorner's termination that she immediately washed her hands of the Union and had no further contact with it because she believed their strategy in dealing with her complaint would not obtain the result she desired—Dorner's termination as well as Rojas' being required to step down as a union steward. Further, we know that from the time Wright went to Rojas and complained and then to UPS management, or more accurately, management came to her, at which time Wright immediately filed a grievance on which management acted *posthaste*, there was no further sexual harassment by Dorner. As a result, this was not a case where it was necessary for the Union to file a formal grievance in order to get company management to act or to end the sexual harassment by Dorner. Thus, there is no evidence from which a reasonable jury could infer that the Union's approach of first using informal means of ending Dorner's harassment of Wright would have been successful or unsuccessful in preventing Dorner's sexual harassment. In addition, there is no evidence from which a reasonable jury could infer that the Union would not have taken whatever additional action was necessary to end the sexual harassment, including filing a formal grievance, if its informal approach did not prove to be effective in stopping the complained-of sexual harassment. Without

such proof, Wright is unable to demonstrate that the Union failed or refused to take reasonable and adequate remedial action which would end the sexual harassment by Dorner and that the harassment did not cease, which is necessary to show a breach of the Union's Title VII duty.

Wright also argues that the Union not only failed to represent her by not taking affirmative action on her behalf, but failed to represent her in that by representing Dorner and opposing his termination, it was, in effect, attempting to put up roadblocks to her attempts to have Dorner disciplined for his sexual harassment. This argument must fail for two reasons. First, as Wright concedes, the Union had a duty, pursuant to the collective bargaining agreement, to represent both Dorner and Wright, although they had competing interests. In this respect, as noted *supra*, the Union is required to act in good faith when making choices as to how best to represent each union member under the circumstances. From the evidence it cannot be reasonably inferred that the Union in representing Dorner at the Two-state Joint Committee hearing was "opposing" Wright. At most, it could be reasonably inferred that the Union was allowing an impartial committee of **both** union and management representatives to make an impartial decision between the competing interests of union members, which would seem to be a reasonable manner in which to resolve the conflict and in keeping with the good faith requirement of representing union members with competing interests. Further, in this argument, Wright is again equating the "disciplining" of Dorner for his sexual harassment with "terminating" Dorner. For purposes of ending his sexual harassment of her, the two are not necessarily the same. There is no evidence from which to reasonably infer that his harassment of her would only cease upon his termination. There is also no evidence from which to reasonably infer that the Union opposed disciplining Dorner in order to stop his sexual harassment, but only evidence that it opposed his termination, which the Union characterized as the equivalent of "industrial capital punishment." Thus, contrary to Wright's contention, it cannot be reasonably inferred that by opposing his termination,

the Union was, in effect, attempting to prevent the disciplining of Dorner necessary to stop his sexual harassment of her.

We, of course, recognize Wright's argument that whether or not the sexual harassment by Dorner ceased after her complaint to the Union is irrelevant to her Title VII claim of hostile-work-environment sexual-harassment. Wright argues that regardless of whether Dorner's sexual harassment ceased, the Union's refusal to file a grievance and its opposition to his termination constituted, in and of themselves, sexual harassment by the Union violative of Title VII in that the Union's actions were gender based and degraded and demeaned her, exposing her to disadvantageous terms or conditions of employment. In other words, she is contending that the acts of the Union's agents in not doing as she requested, regardless of whether Dorner's actions ceased, created a hostile or offensive work environment subjecting the Union to Title VII liability.

Other than her claim of retaliation, which we discuss *infra*, Wright's allegations of sexual harassment against the Union are based on the acts of its agents in refusing to represent her on her sexual harassment complaint against Dorner. Unlike her allegations against Dorner, Wright does not allege that the Union agents in question were guilty of name calling, offensive jokes, threats of or physical violence, lewd and suggestive remarks, demands for sexual favors, etc., or what have been referred to as direct sexual harassment. *See Anspach*, 817 F.Supp. at 1516. What Wright alleges is that the Union agents discriminated against her in the way they responded to her sexual harassment complaint against Dorner. Contrary to Wright's contention, federal decisions finding union Title VII liability involving such allegations and factual situations have been predicated on a failure of the union, pursuant to its duty of fair representation, to combat the complained-of sexual harassment. Wright cites no authority nor can we find any that supports her theory of Title VII liability based on the acts of the Union she alleges.

Wright's argument ignores the nature of the acts of the Union agents on which she

predicates her Title VII claim of sexual harassment and misconstrues the cases that have previously dealt with union Title VII liability for failing or refusing to file grievances once put on notice of discrimination in the workplace. Wright's sexual harassment claim against the Union originates with her complaint against Dorner for sexual harassment. Thus, under the case law discussed *supra*, it is the response of the Union to this complaint on which Wright's claim of sexual harassment against the Union must rise or fall. The proper focus then in determining the Union's Title VII liability for refusing to file a grievance and in opposing Dorner's termination is its response to Wright's sexual harassment complaint against Dorner and whether it adequately addressed it. However, Wright confuses the issue by arguing that the focus should be on the Union's response to Rojas' and McLaughlin's refusal to file a grievance and in opposing Dorner's termination, instead of the Union's response to her complaint against Dorner. She contends that the Union should have taken steps to insure that Rojas and McLaughlin understood that they should have filed the grievance as she requested and that the refusal to do so created a hostile or abusive work environment. Neither case law nor logic supports such a position. In support of her argument, Wright cites us to *Kopp*, 13 F.3d at 264 and *Marquart v. Lodge 837*, 26 F.3d 842, 845 (8th Cir.1994). We find her reliance on these cases to be misplaced.

Wright cites *Kopp* for the proposition that an act by a union is discriminatory and violative of Title VII if it exposes members of one sex to disadvantageous terms or conditions of employment to which members of the other sex are not exposed. In this respect, Wright contends the refusal of the Union to process her grievance and seek Dorner's termination exposed her to disadvantageous terms or conditions of employment to which male employees of UPS were not exposed. The *Kopp* court did hold that the "key issue" in determining what acts would support a "hostile-environment sexual-harassment" claim " 'is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.' *Harris v. Fork-*

*lift Systems, Inc.*, [510] U.S. [17] [25], 114 S.Ct. 367, 372, 126 L.Ed.2d 295 (1993) (Ginsburg, J., concurring)." *Kopp*, 13 F.3d at 269. However, *Kopp* offers no support for Wright's contention. *Kopp* did not involve a sexual harassment claim by a union member against a union for refused union representation in responding to a complaint of sexual harassment against a fellow employee and union member. Instead, it involved direct sexual harassment of an employee by a company supervisor. In addition, in relying on *Kopp*, Wright ignores the fact that the *Kopp* court recognized that the employer's Title VII liability in responding to a sexual harassment complaint is ultimately based on whether "[o]nce an employer becomes aware of sexual harassment, it [ ] take[s] remedial action which is reasonably calculated to end the harassment." *Kopp*, 13 F.3d at 269.

As to *Marquart*, the court there, in deciding whether a sexual harassment complaint under Title VII was frivolous for purposes of awarding attorneys' fees, did discuss whether the failure by a union to process a sexual harassment complaint would subject it to Title VII liability. In *Marquart*, much like here, the plaintiff alleged that she was harassed by male employees and union members because she was female and that the harassment affected her conditions of employment by creating a hostile work atmosphere. The plaintiff also alleged that the union knew about the harassment but refused to process her complaint because the individuals who harassed her were favored by the union. The court, in holding that the plaintiff's claim against the union was not frivolous for purposes of awarding attorneys' fees, found that the refusal to process a sexual harassment complaint could subject a union to Title VII liability. In finding as it did, the court relied on the holdings in *United Food & Commercial Workers*, 963 F.2d at 1082 and *Goodman, supra*.

*United Food & Commercial Workers* was an appeal from the grant by the lower court of the union's motion for summary judgment on the petition of female union members who alleged Title VII liability for unfair union representation. Factually, it involved a situation where female meat wrappers were con-

tending that the union, motivated by gender, failed to fairly represent them in negotiating the new collective bargaining agreement which resulted in a reduction of their benefits and affected their job security. This was not a Title VII case of a union's refusal to process a union member's sexual harassment complaint against a fellow employee and union member. The court in *Carter* clearly held that the failure of the union to fairly and impartially represent the interests of its female meat wrappers in contract negotiations on the basis of their sex resulted in a loss of benefits and job security triggering Title VII liability.

We now turn our attention to *Goodman,* the other case relied on by *Marquart.* It involved a factual situation where the union intentionally chose not to file grievances on behalf of black union members even though it knew that the employer was engaging in prohibited discriminatory practices on the basis of race. The union did not file grievances, although they knew they were warranted, because it believed such grievances had little chance of success, and it did not want to antagonize the employer jeopardizing its chances of success on other issues. The *Goodman* court based Title VII liability on the union's refusal to combat discrimination by the employer by filing grievances when such action was indicated as being necessary to prevent the discrimination claimed.[4] Thus, it offers no support for Wright's interpretation of Title VII liability for refused union representation.

From our reading of the cases, including *Marquart* interpreted in light of *Carter* and *Goodman,* we find no support for Wright's contention that the Union's refusal to file a grievance and seek the termination of Dor-

ner constituted sexual harassment under Title VII without a showing that the filing of the grievance and termination was necessary to combat the complained-of sexual harassment. The failure to process a sexual harassment grievance, when requested, has not been found to expose members of one sex to disadvantageous terms or conditions of employment to which members of the other sex are not exposed to support Title VII liability, unless the grievance was necessary to end the complained-of sexual harassment. This is a logical result inasmuch as grievances are by their very nature designed to coerce the employer into taking any action within its power to remedy discrimination in the workplace. If the reason for filing the grievance is accomplished, the cessation of the complained-of sexual harassment, without the need of a formal grievance actually being filed and the offending employee and union member terminated, then the fact one is not filed and the employee is not terminated would not have any bearing on the terms or conditions of employment and Title VII liability.

In response to a sexual harassment complaint by one employee and union member against another, neither the collective bargaining agreement nor Title VII mandated that the Union file a formal grievance seeking Dorner's termination. What was mandated was that the Union do whatever was necessary and reasonable under the circumstances to end the complained-of sexual harassment. Because the filing of a formal grievance and termination of Dorner was not mandated, the Union's failure or refusal to do that which was not required would not logically be construed as being *per se* violative of Title VII as Wright contends, regardless of

---

4. The *Marquart* court incorrectly states that the *Goodman* court found union liability based on a violation of 42 U.S.C.2000e–2(c)(3), § 703(c)(3) of the 1964 Civil Rights Act, when in fact, the court there expressly found liability based on a violation of 42 U.S.C.2000e–2(c)(1), § 703(c)(1) of the 1964 Civil Rights Act. *Goodman,* 482 U.S. at 666–68, 107 S.Ct. at 2624. As noted *supra,* § 2000e–2(c)(1) makes it unlawful for a labor organization "to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin[.]" Whereas § 2000e–2(c)(3) makes it unlawful for a labor organization "to cause or attempt to cause an employer to discriminate against an individual in violation of this section." In affirming the decision of the Tenth Circuit, the United States Supreme Court in *Goodman* recognized that the intentional refusal of the Union to process legitimate grievances was violative of § 703(c)(1), not § 703(c)(3). *Goodman,* 482 U.S. at 666–68, 107 S.Ct. at 2624. Although the court declined to decide whether the reach of § 703(c)(3) was sufficient to encompass a refusal to process harassment complaints, it did hold that such conduct violated § 703(c)(1). *Goodman,* 482 U.S. at 666–68, 107 S.Ct. at 2624.

the characterization of the case as one for breach of a union's duty of fair representation or hostile-work-environment. To hold otherwise would mean that unions could be held liable under Title VII for creating a hostile or offensive work environment for refusing to file a grievance and to seek termination of an employee and union member simply because it was requested, even when the same was not necessary to end the complained-of discrimination, in this case sexual harassment. We believe such a result is not supported by the case law and is illogical, unreasonable, and not mandated by Title VII.

■ Even assuming, *arguendo*, that we were to agree with Wright's interpretation of the Union's Title VII liability for failure to pursue a formal grievance on her behalf, she still had the burden of proving that the Union's conduct was sufficiently severe or pervasive to establish an objectively hostile work environment. *Harris*, 510 U.S. at 20–22, 114 S.Ct. at 370. More than a few incidents are required. *Meritor Sav. Bank, FSB*, 106 S.Ct. At 2405. The evidence here does not establish that the Union's failure to file grievances was sufficiently severe or pervasive to establish Title VII liability.

Viewing the evidence in its most favorable light to Wright and giving her the benefit of every reasonable inference which the evidence tends to support, while disregarding all contrary evidence, we find that Wright did not make a submissible case of sexual harassment under Title VII against the Union for refusing to file a grievance and opposing Dorner's termination, no matter how reprehensible his alleged acts. From the evidence favorable to submission, reasonable minds could only conclude that the refusal of the Union to file a grievance and its opposition to Dorner's termination did not breach any duty owed to Wright and did not violate Title VII in that almost simultaneously with Wright's complaint and request for the Union to file a formal grievance seeking Dorner's termination, she filed a grievance with management's assistance, which led to an immediate investigation and disciplining of Dorner, after which there was no further sexual harassment by him.

Having found that Wright did not make a submissible case of sexual harassment under Title VII for the Union's refusal to file a grievance and in opposing Dorner's termination, we now turn our attention to Wright's claim of sexual harassment based on retaliation.

## 2. Retaliation

■ Although her verdict director clearly did not instruct on retaliation as a basis for Title VII liability, Wright claims that she made a submissible case against the Union for sexual harassment in that its agents McLaughlin and Rojas retaliated against her for pursuing her sexual harassment complaint by knowingly publishing false and defamatory statements about her during the Two-state Joint Committee hearing. The Union contends that the publishing of the statements was not retaliatory, but was done in its good faith representation of Dorner as required by the collective bargaining agreement. Unlike her other allegations of sexual harassment against the Union, in this allegation, Wright is alleging direct sexual harassment.

■ Retaliation by a union against an employee and union member for filing a charge of unlawful discrimination has been held to be a violation of Title VII. *See* 42 U.S.C., § 2000e3; *Martin*, 859 F.2d at 585; *Romero*, 615 F.2d at 1309–10. "To establish a *prima facie* case of discriminatory retaliation, [plaintiff] must establish: '(1) that [she] filed a charge of unlawful discrimination, (2) that [the union] took adverse action against [her], and (3) that the adverse action was linked to the filing of the charge of unlawful discrimination.'" (citations omitted). *Martin*, 859 F.2d at 585. There is no requirement that the underlying charge of unlawful discrimination be successful.

As we found *supra*, the Union had a duty to fairly and impartially represent Dorner at the Two-state Joint Committee hearing even though Dorner and Wright had competing interests, as long as it did so in good faith. Certainly, no one would quibble with the fact that in its good faith representation of Dorner, the Union was permitted to offer evi-

dence to demonstrate that Dorner's advances were not unwelcome, such as the statements of fellow employees and union members. *See Meritor Sav. Bank, FSB,* 477 U.S. at 67–69, 106 S.Ct. at 2406 (holding that actions and comments are not sexually harassing unless they are unwelcome; actions and comments of plaintiff are relevant in determining whether actions and comments of defendant are unwelcome); *see also Moylan,* 792 F.2d at 749; *Hall,* 842 F.2d at 1014 (citing *Moylan* ). However, no one would argue with the fact that such good faith representation would not include knowingly publishing false and defamatory statements about the complainant. This would, of course, if gender motivated, constitute the type of retaliation prohibited by Title VII. Thus, we must determine whether, as Wright alleges, there was sufficient evidence from which a reasonable jury could infer that the Union knowingly published false and defamatory statements about her in response to her pursuit of her sexual harassment complaint against Dorner.

This is basically the same issue we were required to decide *supra,* in regard to Wright's claim of defamation. There we found the evidence was insufficient to make a submissible case that the Union either knowingly or recklessly obtained and/or published false and defamatory statements about Wright. Because we have already found the evidence to be lacking as to the Union's knowingly obtaining and/or publishing false and defamatory statements about Wright, we also find that she failed to make a submissible case of sexual harassment against the Union for retaliation based on such publication.

Because we find that Wright failed to make a submissible case under Title VII for sexual harassment on any reasonable basis, we find the trial court erred in failing to sustain the Union's motion for a directed verdict at the close of Wright's evidence and in failing to sustain its motion for JNOV. Thus, the jury verdict for Wright on her claim of sexual harassment against the Union must be reversed. And, because of this disposition, we need not address the other points of the Union or Wright raised as to Wright's claim of sexual harassment against the Union.

## Conclusion

As to the trial court's judgment dismissing Wright's claim of defamation against the Union, we affirm. As to the trial court's judgment for Wright in the amount of $50,000 entered on the jury's verdict for her on her claim of sexual harassment, we reverse and remand with directions that the trial court set aside the verdict and enter judgment for the Union consistent with this opinion.