**Carlos DECKARD, Jr., Respondent,**

v.

**O'REILLY AUTOMOTIVE, INC., Appellant.**

**No. WD 57385.**

Missouri Court of Appeals, Western District.

Aug. 1, 2000.

Motion For Rehearing and/or Transfer to Supreme Court Denied Oct. 3, 2000.

Application for Transfer Denied Dec. 5, 2000.

Larry Michael Schumaker, Kansas City, for appellant

David Milton Skeens, Kansas City, for respondent.

Before LOWENSTEIN, P.J., ULRICH, J. and HOLLIGER, J.

ROBERT G. ULRICH, Judge.

O'Reilly Automotive, Inc. appeals the judgment of the trial court entered in favor of Carlos Deckard in the amount of

$275,830 in his defamation action. O'Reilly raises several points on appeal. First, it claims that the trial court erred in denying its motion to vacate the judgment and dismiss Mr. Deckard's petition because the court lacked subject matter jurisdiction. Second, O'Reilly argues that the trial court erred in denying its motion for judgment notwithstanding the verdict because Mr. Deckard did not present sufficient evidence to make a submissible case of defamation. Finally, O'Reilly claims that the trial court erred in denying its motion for a new trial based on instructional error. The judgment of the trial court is reversed, and the case is remanded for a new trial.

Carlos Deckard is a former employee of O'Reilly Automotive, Inc. Mr. Deckard worked for O'Reilly for nearly eight years. At the time of his termination, Mr. Deckard was the assistant manager at the O'Reilly retail store in El Dorado Springs. His job duties included counter sales, paperwork, checking and approving invoices, and supervising the store when the store manager, Kevin Greven, was not working.

On Friday, January 26, 1996, Mr. Greven went home sick at 11:00 a.m. leaving Mr. Deckard in charge of the store. Four other employees were working in the store that day with Mr. Deckard —Gregg Fast, Mike Spencer, Jami Crouch, and Juanita Boram. Each had been assigned an exclusive "counter number" to transact O'Reilly's business. Between 11:40 a.m. and 12:30 p.m., someone stole approximately $160 by creating a fraudulent charge sale invoice and two fraudulent cash refund invoices.[1] Two of the fraudulent invoices were written by someone who used Mr. Deckard's exclusive counter number.[2] The third fraudulent invoice was written using Gregg Fast's exclusive counter number. When Mr. Fast discovered the fraudulent

refund invoice with his counter number imprinted on it, he became suspicious and telephoned Earl Kaltenbach, the district manager. Mr. Kaltenbach made plans to travel to the El Dorado Springs store the following Monday to investigate.

The next day, Saturday, January 27, was the store manager's scheduled day off; therefore, Mr. Deckard, as assistant store manager, was in charge of the store. As the manager on duty, Mr. Deckard processed all of the previous day's paperwork and approved the previous day's invoices including initialing the two fraudulent cash refund invoices.

Earl Kaltenbach arrived at the El Dorado Springs store on Monday morning, January 29, to investigate the suspicious invoices. He and Mr. Greven spoke with Mr. Deckard about the invoices. Initially, Mr. Deckard thought the men were seeking his help in determining who had created the fraudulent invoices. By the end of the meeting, Mr. Deckard understood that Mr. Kaltenbach was "upset with" or "accusing" him.

Mr. Deckard met with Bruce Dowell and David Bellamy, loss prevention auditors with O'Reilly, the next day, Tuesday, January 30. Mr. Dowell asked Mr. Deckard to explain the three fraudulent invoices, and Mr. Deckard denied writing them. At the end of the meeting, Mr. Dowell informed Mr. Deckard that he was suspended indefinitely without pay and asked Mr. Deckard to leave the store.

On January 31, Mr. Greven, the store manager, told Jami Crouch and Jerry McCullick, employees of the store, that Mr. Deckard was no longer with the company because he had been making false tickets and stealing company money. On February 1 or 2, Mr. Kaltenbach informed

1. It appears the charge sale invoice was created to balance out the two cash refund invoices.

2. Because employees of O'Reilly received a commission on sales they made, the employees knew each other's counter number in case they had to ring up another employee's sale. An employee, however, was not to use another employee's counter number on a return.

Joe Barger, the customer on whose account the fraudulent charge sale had been written, that his account had been credited and that Mr. Deckard had been dismissed over the incident. Mr. Dowell telephoned Mr. Deckard on February 2, 1996, and informed him that he was terminated for loss of confidence. Mr. Deckard testified that he understood this to mean he was fired for theft.

Mr. Deckard applied for a job with AutoZone Auto Parts Inc, a competitor of O'Reilly, in May of 1996. On his application, Mr. Deckard wrote that he had been terminated from O'Reilly because of a disagreement with upper management. Mr. Deckard subsequently interviewed with Scott Anderson, a recruiter for AutoZone, and Mr. Anderson asked him to explain why he had been terminated by O'Reilly. Mr. Deckard told Mr. Anderson that he had been unfairly fired for theft. After learning why Mr. Deckard left his employment with O'Reilly, Mr. Anderson lost interest in hiring Mr. Deckard. Mr. Deckard eventually got a job at Allison Auto Parts making minimum wage with no benefits.

Mr. Deckard filed his petition for damages on December 10, 1997. In his defamation claim, Mr. Deckard alleged that O'Reilly, by and through its officers, employees, and agents, made the defamatory statement that Mr. Deckard was a thief to a number of persons in the El Dorado Springs community including other O'Reilly employees and customers and that, as a result, his reputation was damaged. Mr. Deckard also alleged that he had to repeat the defamatory statement in the course of his search for new employment. Mr. Deckard alleged that he suffered actual damages in the form of mental anguish, loss of standing in the community, personal humiliation, and loss of income and other benefits associated with his inability to find other comparable work. Mr. Deckard also sought punitive damages alleging that O'Reilly acted with malice in making the defamatory statement. Following trial,

the jury returned its verdict in favor of Mr. Deckard awarding him $125,830 in actual damages and $150,000 in punitive damages. O'Reilly filed a timely motion for judgment notwithstanding the verdict or, in the alternative, for a new trial, as well as a motion to vacate the judgment and vacate plaintiff's petition for lack of subject matter jurisdiction. The trial court denied O'Reilly's post-trial motions. This appeal followed.

## I. Jurisdiction

O'Reilly initially claims that the trial court erred in denying its motion to vacate the judgment and dismiss Mr. Deckard's petition because the court lacked subject matter jurisdiction. O'Reilly contends that Mr. Deckard's defamation claim came within the exclusive, primary jurisdiction of the Workers' Compensation Law and the Labor and Industrial Relations Commission (LIRC).

The issue of the lack of subject matter jurisdiction may be raised at any time during a proceeding. *Brunig v. Humburg*, 957 S.W.2d 345, 348 (Mo.App. E.D.1997). A motion to dismiss for lack of subject matter jurisdiction is the proper method to raise the exclusivity of the Workers' Compensation Law as a defense to a tort action. *Burns v. Employer Health Servs., Inc.*, 976 S.W.2d 639, 641 (Mo.App. W.D.1998). The motion to dismiss should be granted when it appears, by a preponderance of the evidence, that the trial court lacks subject matter jurisdiction. Rule 55.27(g)(3); *Burns*, 976 S.W.2d at 641. Although the party raising the defense has the burden of proving lack of subject matter jurisdiction, the quantum of proof is not high. *Burns*, 976 S.W.2d at 641. Where a question of jurisdiction is in doubt, it should be resolved in favor of the LIRC. *James v. Union Elec. Co.*, 978 S.W.2d 372, 374 (Mo.App. E.D.1998).

In determining whether it has jurisdiction, the court may consider affidavits, exhibits, and evidence pursuant to

Rules 55.27 and 55.28. *Burns,* 976 S.W.2d at 641. Whether a case falls within the exclusive jurisdiction of the LIRC is a question of fact, therefore, the determination should be left to the sound discretion of the trial court. *Id.* Thus, the appellate court's review is for an abuse of discretion. *Id.* "The trial court abuses its discretion when its ruling is clearly against the logic of the circumstances and is so arbitrary and unreasonable that it shocks the sense of justice and indicates a lack of careful consideration." *Id.* (citation omitted).

■■■■ The Workers' Compensation Law is wholly substitutional in character, and the plaintiff's common law rights have been supplanted and superseded by the act, if the Law is applicable. *Killian v. J & J Installers, Inc.,* 802 S.W.2d 158, 160 (Mo. banc 1991). Section 287.120, RSMo 1994, provides in pertinent part:

1. Every employer subject to the provisions of this chapter shall be liable, irrespective of negligence, to furnish compensation under the provisions of this chapter for personal injury or death of the employee by accident arising out of and in the course of his employment, and shall be released from all other liability therefor whatsoever, whether to the employee or any other person. The term "accident" as used in this section shall include, but not be limited to, injury or death of the employee caused by the unprovoked violence or assault against the employee by any person.
2. The rights and remedies herein granted to an employee shall exclude all other rights and remedies of the employee, his wife, her husband, parents, personal representatives, dependents, heirs or next of kin, at common law or otherwise, on account of such accidental injury or death, except such rights and remedies as are not provided for by this chapter.

§ 287.120, RSMo 1994. Thus, the exclusive remedy for injury or death of an employee from an accident arising out of and in the course of employment is a claim for compensation under Chapter 287. *Lovelace v. Long John Silver's, Inc.,* 841 S.W.2d 682, 686 (Mo.App. W.D.1992). The Workers' Compensation Law, however, bars common law suits for only those damages covered by the Law and for which compensation is made available under its provisions. § 287.120.2, RSMo 1994; *Gambrell v. Kansas City Chiefs Football Club, Inc.,* 562 S.W.2d 163, 165 (Mo.App.1978). Thus, an employee is free, despite the Workers' Compensation Law, to bring suit at common law for wrongs not comprehended within the Law. *Gambrell,* 562 S.W.2d at 165. The key to whether the Workers' Compensation Law precludes a common law right of action lies in the nature of the injury for which plaintiff makes claim, not the nature of defendant's act which plaintiff alleges to have been responsible for that injury. *Id.* at 168.

■■■■ Under the doctrine of primary jurisdiction, the LIRC also has exclusive original jurisdiction to determine the facts that establish jurisdiction or, in other words, whether the injury falls within the Workers' Compensation Law. *Killian,* 802 S.W.2d at 160 (citing *Hannah v. Mallinckrodt, Inc.,* 633 S.W.2d 723, 726 (Mo. banc 1982)); *Lovelace,* 841 S.W.2d at 686. According to the doctrine of primary jurisdiction, a judicial court is restrained from adjudicating a question within the jurisdiction of an administrative tribunal until that tribunal has rendered its decision. *Killian,* 802 S.W.2d at 160. Deference to the tribunal or agency is justified where (1) administrative knowledge and expertise are demanded, (2) technical or intricate fact questions are to be determined, and (3) uniformity is important to the regulatory scheme. *Id.*

■■■ Determinations of whether there was an accident arising out of and in the course of employment and whether an employee's injury resulted from an accident or an intentional act of the employer are questions requiring agency expertise; thus, the LIRC has exclusive jurisdiction

to make such determinations. *Id.* at 160–161; *Lovelace*, 841 S.W.2d at 686. Conversely, the trial court retains authority to determine the fundamental issue of whether an employer/employee relationship existed at the time of injury. *Killian*, 802 S.W.2d at 160 (citing *Jones v. Jay Truck Driver Training Center, Inc.*, 709 S.W.2d 114, 115 (Mo. banc 1986)).

■ In this case, the doctrine of primary jurisdiction did not apply to give the LIRC original jurisdiction to determine the facts that establish jurisdiction. The trial court made a determination on the fundamental issue of whether an employment relationship existed at the time of injury. The court concluded that the alleged defamatory statements and any resultant injury to Mr. Deckard's reputation did not occur until after O'Reilly terminated Mr. Deckard's employment. Sufficient evidence was presented to support the trial court's conclusion. On Tuesday, January 30, Mr. Deckard was informed by Bruce Dowell, the loss prevention auditor, that he was suspended indefinitely without pay and was then asked to leave the premises. An internal memo written by Mr. Dowell indicated that the decision to terminate Mr. Deckard was made the next day, January 31. That same day, Kevin Greven, the store manager, informed other employees of O'Reilly that Mr. Deckard was no longer with the company. Mr. Greven then made the first alleged defamatory statement to Jami Crouch. The trial court, therefore, retained authority to determine whether Mr. Deckard's injury fell within the exclusive jurisdiction of the Workers' Compensation Law.

■ For the same reason that the LIRC did not have primary jurisdiction in this case, Mr. Deckard's defamation claim did not come within the exclusive jurisdiction of the Workers' Compensation Law. At the time of the alleged injury to Mr. Deckard's reputation, he was no longer an employee of O'Reilly. *See Kientzy v. McDonnell Douglas Corp.*, 990 F.2d 1051, 1060–1061 (8th Cir.1993)(where plaintiff's emotional distress injury did not arise until after her discharge from employment, the workers' compensation law did not apply).

■ Even if an employment relationship existed at the time the alleged defamatory statements were made, Mr. Deckard's defamation claim did not fall within the exclusive jurisdiction of the Workers' Compensation Law for another reason. The Workers' Compensation Law contains no provision for compensation for damage sustained by an employee from defamation by his employer. Injury to reputation is not the type of injury contemplated by the Workers' Compensation Law. *Gambrell*, 562 S.W.2d at 165. With the Workers' Compensation Law, the legislature provided a remedy for injury or death of an employee from an accident arising out of and in the course of employment. The legislature did not intend for the Law to entirely subvert every common law tort action that may arise between an employer and an employee. Mr. Deckard's defamation claim against his former employer, O'Reilly, therefore, did not fall within the primary or exclusive jurisdiction of the Workers' Compensation Law and the LIRC. The trial court had subject matter jurisdiction over the claim, and the court did not abuse its discretion in overruling O'Reilly's motion to dismiss.

## II. Qualified Privilege

In the next point, O'Reilly claims that the trial court erred in submitting the burden of proof instruction based on MAI 5th 3.06, the verdict director based on MAI 5th 23.10(1), and the affirmative defense instruction (Instruction Nos. 5, 6, and 8). O'Reilly argues that the statements made to Jami Crouch, Joe Barger, and Scott Anderson[3] were qualifiedly privileged and,

---

**3.** Because it is held in section IIIA below that Mr. Deckard failed to make a submissible case on his claim that O'Reilly communicated

a defamatory statement to Scott Anderson, O'Reilly's claim under this point that the com-

therefore, MAI 5th 3.05 and 23.10(2), which incorporate the malice standard, should have been used. It contends that submission of the instructions based on MAI 5th 3.06 and 23.10(1) improperly placed upon it the risk of nonpersuasion on the issue of truth/falsity instead of requiring Mr. Deckard to establish the falsity of the claimed defamatory statement by clear and convincing evidence.

■■■ When a defendant is alleged to have made an actionable defamatory statement, the burden is upon the defendant to prove that it is entitled to the defense of qualified privilege. *Wright v. Over–The–Road and City Transfer Drivers, Helpers, Dockmen and Warehousemen,* 945 S.W.2d 481, 494 (Mo.App. W.D.1997). A communication is qualifiedly privileged when "it is made in good faith upon any subject-matter in which the person making the communication has an interest or in reference to which he has a duty, and to a person having a corresponding interest or duty." *Rice v. Hodapp,* 919 S.W.2d 240, 244 (Mo. banc 1996); *Carter v. Willert Home Products, Inc.,* 714 S.W.2d 506, 513 (Mo. banc 1986), *abrogated on other grounds by Nazeri v. Missouri Valley College,* 860 S.W.2d 303 (Mo. banc 1993) (citation omitted). Applying this principle, a communication regarding the character or qualifications of an employee or former employee "is qualifiedly privileged if made in good faith by a person having a duty in the premises to one who has a definite interest therein." *Carter,* 714 S.W.2d at 513 (quoting *Cash v. Empire Gas Corp.,* 547 S.W.2d 830, 833 (Mo.App.1976)). A "qualified privilege arises from the necessity of full and unrestricted communication concerning a matter in which the parties have an interest or duty." 50 Am.Jur.2d *Libel and Slander* § 276 (1995). Whether the surrounding circumstances and relationships are such as to give rise to a qualified privilege is a question of law to be decided by the trial court. *Rice,* 919 S.W.2d at 244; *Carter,* 714 S.W.2d at 513; *Hellesen v. Knaus*

munication to Scott Anderson was qualifiedly

*Truck Lines, Inc.,* 370 S.W.2d 341, 345 (Mo.1963). An appellate court's review of a question of law is *de novo. Williams v. Kimes,* 996 S.W.2d 43, 44 (Mo. banc 1999).

■■■ When the trial court determines that a qualified privilege exists, the plaintiff may overcome the qualified privilege by proving by clear and convincing evidence that either (1) the defendant made the defamatory statement in bad faith or with actual malice or that (2) "the statements made exceed the exigencies of the situation." *Rice,* 919 S.W.2d at 244; *Carter,* 714 S.W.2d at 513; *Hellesen,* 370 S.W.2d at 345; *Wright,* 945 S.W.2d at 494. The law will not infer malice where an otherwise false and defamatory communication is qualifiedly privileged; rather the existence thereof must be shown by some evidence beyond the falsity of the statement communicated. *Rice,* 919 S.W.2d at 244; *Carter,* 714 S.W.2d at 513. To prove malice, the plaintiff must show that "the statements were made with knowledge that they were false or with reckless disregard for whether they were true or false at a time when defendant had serious doubts as to whether they were true." *Rice,* 919 S.W.2d at 244; *Carter,* 714 S.W.2d at 512. Whether the defendant acted with malice in making the defamatory statement or whether the statement made exceeded the exigencies of the situation are questions of fact for the jury, unless no substantial evidence of actual malice is presented, in which case the court should direct a verdict. *Hellesen,* 370 S.W.2d at 345; *Wright,* 945 S.W.2d at 490. Consequently, if the trial court has determined as a question of law that a qualified privilege applies and the plaintiff has made a submissible case of actual malice, a verdict director based on MAI 5th 23.10(2), which incorporates the malice standard, should be submitted to the jury. *Carter,* 714 S.W.2d at 513; MAI 5th 23.10(1) Notes on Use 1 (1996).

privileged is not addressed.

■ In this case, O'Reilly's communications to Jami Crouch and Joe Barger were qualifiedly privileged. The day after Mr. Deckard was suspended indefinitely without pay, Kevin Greven, the store manager, had a conversation with Jami Crouch and another employee of the store concerning the situation with Mr. Deckard. Mr. Greven explained to Ms. Crouch and the other employee that if customers asked for Mr. Deckard, they were to tell them only that he was not working that day. They were not to elaborate further. Mr. Greven then told Ms. Crouch and another employee that Mr. Deckard was no longer with the company because he had been making false tickets and stealing company money. Such conversation between supervisory and non-supervisory personnel was a situation for which a qualified privilege existed. *Rice*, 919 S.W.2d at 244. Mr. Greven's statements to Ms. Crouch and the other employee were justified because they related to matters of common interest to the employer, O'Reilly, and its employees. First, it was reasonable that management would inform its employees that Mr. Deckard, the assistant manager, no longer worked for the company. Additionally, O'Reilly had an interest in preparing its employees to respond to reasonably anticipated inquiries from customers about Mr. Deckard's absence. Finally, Mr. Greven's statements concerning O'Reilly's policy regarding employee theft and the consequences of violating that policy pertained to a subject matter about which both management and employees had some knowledge and interest. *Id.* at 244; *Schnelting v. Coors Distributing Co. of Missouri*, 729 S.W.2d 212, 216 n. 4 (Mo.App. E.D.1987). O'Reilly's communication to Ms. Crouch was, therefore, qualifiedly privileged.

■ Likewise, a qualified privilege existed regarding O'Reilly's communication to Joe Barger, the customer on whose account the fraudulent charge sale had been written. A few days after the fraudulent invoices were written, Earl Kalten-bach, the district manager, informed Joe Barger that an employee had taken money from Mr. Barger's account, that his account had been credited, and that Mr. Deckard had been dismissed because of the incident. The business/customer relationship between O'Reilly and Mr. Barger and the problem O'Reilly had with Mr. Barger's account created a common interest justifying a privileged communication between the two parties. O'Reilly had an interest in providing a valid explanation to Mr. Barger about the reason for the misuse of his account, known to Mr. Barger to have occurred, and that the irregular use of his account had been remedied. The communication regarding Mr. Barger's account was, therefore, qualifiedly privileged.

■ The trial court erred in finding that O'Reilly did not have a qualified privilege regarding its communications to Jami Crouch and Joe Barger, although, as discussed in section IIIB below, Mr. Deckard made a submissible case of actual malice to defeat or overcome the privilege. Verdict directing instructions based on MAI 5th 23.10(2) and the corresponding burden of proof instructions based on MAI 5th 3.05, therefore, should have been submitted with regard to O'Reilly's communications to Ms. Crouch and Mr. Barger to allow the jury to decide whether the statements were made in good faith without actual malice and were properly limited in their scope.

## III. Submissibility of the Case

In the final point addressed in this appeal, O'Reilly claims that the trial court erred in submitting Instruction No. 6, the verdict directing instruction, which contained three disjunctive theories of liability. O'Reilly contends that Mr. Deckard failed to present sufficient evidence to support each disjunctive alternative submitted.

■ Any instruction submitted to a jury must be supported by substantial evidence. *Griffin v. Kansas City Southern*

*Ry. Co.*, 965 S.W.2d 458, 462 (Mo.App. W.D.1998). Whether sufficient evidence was presented to submit an issue to the jury is a legal question and not an exercise of judicial discretion. *King v. Unidynamics Corp.*, 943 S.W.2d 262, 267 (Mo.App. E.D.1997). A case is not to be submitted to the jury unless each fact essential to liability is predicated upon legal and substantial evidence. *Id.* In reviewing the submissibility of an instruction, an appellate court views the evidence and reasonable inferences in the light most favorable to the instruction and disregards all contrary evidence and inferences. *Id.*

The verdict directing instruction in this case was as follows:

■ Your verdict must be for plaintiff if you believe:

First, defendant stated that plaintiff was a thief; and

Second, defendant was at fault in making such statement; and

Third, such statement tended to deprive the plaintiff of the benefit of public confidence in his honesty or expose him to contempt in his social associations; and

Fourth, such statement was heard by one or more of the following persons:

Scott Anderson; or

Joe Barger; or

Jami Crouch; and

Fifth, plaintiff's reputation was thereby damaged.

The instruction submitted three disjunctive theories of liability: (1) that O'Reilly communicated a defamatory statement about Mr. Deckard to Scott Anderson; (2) that O'Reilly communicated a defamatory statement about Mr. Deckard to Joe Barger; or (3) that O'Reilly communicated a defamatory statement about Mr. Deckard to Jami Crouch. Where an instruction is given in the disjunctive, each alternative submitted in the instruction must be supported by evidence. *Griffin*, 965 S.W.2d at 459; *Ladish v. Gordon*, 879 S.W.2d 623, 628 (Mo.App. W.D.1994). If each allegation presented in the instruction is not supported by the evidence, the giving of the instruction is error. *Id.*

■ To make a submissible case of defamation, the plaintiff, who is not a public figure, must plead and prove the following elements: (1) publication, (2) of a defamatory statement, (3) that identifies the plaintiff, (4) that is false, (5) that is published with the requisite degree of fault, and (6) that damages the plaintiff's reputation. *Overcast v. Billings Mut. Ins. Co.*, 11 S.W.3d 62, 70 (Mo. banc 2000)(citing *Nazeri v. Missouri Valley College*, 860 S.W.2d 303 (Mo. banc 1993)). O'Reilly claims that insufficient evidence was presented to submit any of the three theories of liability to the jury.

## A. Communication to Scott Anderson

■ First, O'Reilly claims that Mr. Deckard failed to present sufficient evidence that it made a defamatory statement to Scott Anderson, a recruiter for Auto-Zone. Mr. Deckard's defamation claim regarding Mr. Anderson was based on Mr. Deckard's self-publication during a job interview with Mr. Anderson that he had been fired from O'Reilly for theft. While communication of defamatory matter only to the plaintiff who then discloses it to third parties generally does not subject the defendant to liability, an exception exists where the utterer of the defamatory statement intends, or has reason to suppose, that in the ordinary course of events the statement will come to the knowledge of some third person. *Overcast*, 11 S.W.3d at 70; *Herberholt v. dePaul Community Health Ctr.*, 625 S.W.2d 617, 624–625 (Mo. banc 1981). O'Reilly argues, *inter alia*, that the undisputed evidence reveals that Bruce McDowell told Mr. Deckard that he was fired for loss of confidence, and that such statement was not defamatory. It contends that Mr. Deckard's self-publication claim based on his "embellishment" of the words uttered by O'Reilly must fail.

A statement is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him. *Henry v. Halliburton*, 690 S.W.2d 775, 779 (Mo. banc 1985). Whether a statement is capable of having a defamatory meaning is a question of law for the trial court. *Id.*; *Ampleman v. Scheweppe*, 972 S.W.2d 329, 332 (Mo.App. E.D.1998). The trial court must determine whether the communication reasonably conveyed the meaning ascribed to it by plaintiff and, if so, whether the meaning was defamatory in character. *Ampleman*, 972 S.W.2d at 332. In determining whether, as a matter of law, a statement is reasonably capable of a defamatory meaning, two standards are used. *Nazeri v. Missouri Valley College*, 860 S.W.2d 303, 311 (Mo. banc 1993). First, the words must be stripped of any pleaded innuendo and construed in their most innocent sense. *Id.* The words must then be considered in context, giving them their plain and ordinary meaning. *Id.* In other words, the words "are to be taken in the sense which is most obvious and natural according to the ideas they are calculated to convey to those to whom they are addressed." *Id.* (citing *Kirk v. Ebenhoch*, 354 Mo. 762, 191 S.W.2d 643, 645 (Mo. 1945)). While the two standards are not absolutely consistent, they should be considered together. *Nazeri*, 860 S.W.2d at 311.

The evidence at trial was undisputed that Mr. Dowell telephoned Mr. Deckard on February 2, 1996, and informed him that he was fired for loss of confidence. Mr. Dowell did not make any other statements to Mr. Deckard at that time. Although Mr. Dowell informed Mr. Deckard that he was fired for loss of confidence, Mr. Deckard subsequently told Mr. Anderson during an interview that he was terminated from O'Reilly for theft. Mr. Deckard did not republish O'Reilly's com-

munication to Mr. Anderson, but instead communicated his own additional words of which he now complains. O'Reilly's statement to Mr. Deckard that he was fired for loss of confidence alone did not reasonably convey to Mr. Deckard the meaning ascribed by him—that he was fired for theft. Stripped of Mr. Deckard's pleaded innuendo, the plain and ordinary meaning of O'Reilly's statement to Mr. Deckard was that Mr. Deckard was fired because O'Reilly no longer had trust in him as an employee. The statement by Mr. Deckard to Mr. Anderson that he was fired for theft was not necessarily the most obvious and natural meaning O'Reilly was attempting to convey when it stated to Mr. Deckard that he was fired for loss of confidence. Arguably, O'Reilly may have lost trust in Mr. Deckard because it did not know whether he was involved in the theft[4] or because the fraudulent transactions occurred while he was supervising the store as assistant manager and in such manner that caused O'Reilly to doubt his managerial skills. All of these conclusions are equally reasonable interpretations of O'Reilly's statement. O'Reilly's statement to Mr. Deckard, therefore, was not defamatory. Thus, Mr. Deckard failed to make a submissible case on the claim that O'Reilly communicated a defamatory statement about Mr. Deckard to Scott Anderson. Accordingly, submission of the verdict directing instruction, which contained the claim in the disjunctive, was erroneous. The judgment, therefore, is reversed.

An erroneous submission to the jury normally requires reversal and remand for a new trial. *Griffin*, 965 S.W.2d at 461. Generally, addressing other issues raised on appeal is unnecessary. *Id.* In this case, however, O'Reilly argues that the trial court should have granted its motion for JNOV because none of the three theories of liability were supported by substantial evidence. Consequently,

---

4. Evidence was offered at trial that O'Reilly filed a "blind" complaint with the police be-

cause it did not know who committed the theft.

O'Reilly's contention that Mr. Deckard also failed to make a submissible case on his claims that it communicated a defamatory statement to Joe Barger and to Jami Crouch must be considered. *Id.* at 461–462.

### B. Communications to Joe Barger and Jami Crouch

O'Reilly contends that insufficient evidence was presented to submit to the jury Mr. Deckard's claims that it communicated defamatory statements about Mr. Deckard to Joe Barger, a customer of O'Reilly, and to Jami Crouch, an employee. Specifically, O'Reilly argues that Mr. Deckard failed to present substantial evidence that (1) O'Reilly's statement to Mr. Barger was false and defamatory, (2) O'Reilly acted with the requisite degree of fault in making its statements to Mr. Barger and Ms. Crouch, and (3) O'Reilly's statement to Ms. Crouch caused damage to Mr. Deckard's reputation.

First, O'Reilly claims that insufficient evidence was presented that it made a false, defamatory statement to Joe Barger, the customer on whose account the fraudulent sale had been processed. Mr. Barger gave the following testimony at trial regarding the conversation he had with Kevin Greven and Earl Kaltenbach of O'Reilly.

Q: What did they tell you happened?

A: They told me somebody had taken this from our account and that they were going to be investigating to find out what had happened.

Q: And did they come back and tell you what the results of that investigation was at some point in time?

A: Yes, they did.

Q: What did they tell you?

A: The—I think it was about three or four days after they had come down to talk to me about it. They come back down; and the district manager, Earl, had this copy of this invoice with him; and he had brought a credit with this exact amount on it where they had re-

funded my account. They apologized to me for this, and they told me that they had had this problem and that J.R. had been dismissed.

Q: Did they tell you anything about J.R. being dismissed except that he was gone?

A: No. They just told me that he had been dismissed over it.

Q: Did they tell you that right after they told you that they had gotten the matter resolved and who was making the fraudulent tickets?

A: No. I just took it for granted. They said he had been dismissed. So that's what I figured it had been.

Q: Did you take it to mean he got fired for stealing?

A: Yes, sir.

O'Reilly argues that the evidence showed only that it reported "cold facts" to Mr. Barger; specifically, that a fraudulent invoice had been written on his account and that Mr. Deckard had been released as a result of the incident. O'Reilly contends that while the information may have lead Mr. Barger to infer that Mr. Deckard was fired for stealing, the statements were not defamatory. O'Reilly's contention is without merit. As discussed in section IIIA, in determining whether a statement is reasonably capable of a defamatory meaning, the words must be construed in their most innocent sense and considered in context, giving them their plain and ordinary meaning. *Nazeri,* 860 S.W.2d at 311. An objective reading of the communication between Mr. Kaltenbach and Mr. Barger does not allow the words an innocent meaning. O'Reilly informed Mr. Barger that somebody had taken money from Mr. Barger's account and that Mr. Deckard had been dismissed over the problem. That Mr. Deckard had been fired for stealing was the most obvious and natural interpretation of such communication. O'Reilly's specific statements that somebody had taken money from Mr. Barger's account and Mr. Deckard had been dis-

missed because of the occurrence reasonably conveyed without speculation that Mr. Deckard was fired for theft. O'Reilly's statements to Mr. Barger, therefore, were reasonably capable of a defamatory meaning. The point is denied.

Next, O'Reilly claims that Mr. Deckard failed to present sufficient evidence that it acted with the requisite degree of fault in making its statements to Mr. Barger and Ms. Crouch. O'Reilly argues that under the evidence, it was reasonable for it to conclude that Mr. Deckard was the thief, therefore, it did not act with fault, much less actual malice, in making the statements that Mr. Deckard was fired for theft.

 In a defamation claim where the plaintiff is not a public figure, the requisite degree of fault is negligence. *Overcast,* 11 S.W.3d at 70; *Englezos v. Newspress and Gazette Co.,* 980 S.W.2d 25, 30 (Mo.App. W.D.1998). However, to overcome a qualified privilege or to recover punitive damages, the plaintiff is required to prove by clear and convincing evidence[5] that the statements were made with actual malice. *Overcast,* 11 S.W.3d at 70; *Rice v. Hodapp,* 919 S.W.2d 240, 244 (Mo. banc 1996); *Carter v. Willert Home Products, Inc.,* 714 S.W.2d 506, 512 (Mo. banc 1986)(citing *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 349, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974)); *Englezos,* 980 S.W.2d at 30. Actual malice is proven with evidence that the defendant made the statement with knowledge that it was false or with reckless disregard for whether it was true or false at a time when the defendant has serious doubt as to whether it was true. *Overcast,* 11 S.W.3d at 70; *Rice,* 919 S.W.2d at 244; *Carter,* 714 S.W.2d at 512. A defendant acts with reckless disregard for the truth or falsity when it publishes a defamatory statement with a high degree of awareness of the probable falsity of the

statement. *Wright v. Over–The–Road and City Transfer Drivers, Helpers, Dockmen and Warehousemen,* 945 S.W.2d 481, 497 (Mo.App. W.D.1997).

 In this case, sufficient evidence was presented to support submission of the claims that O'Reilly acted with actual malice in making its defamatory statements to Mr. Barger and Ms. Crouch. Specifically, substantial evidence was offered at trial that Earl Kaltenbach, the district manager, and Kevin Greven, the store manager, made the statements that Mr. Deckard was fired for theft at a time when they knew either that the statements were false or, at least, when they had a high degree of awareness of their probable falsity. The evidence, when viewed in a light most favorable to the submission of the claims, revealed that when the statements were made, O'Reilly did not know who committed the theft and that Mr. Deckard was fired for loss of confidence, not theft. Bruce Dowell, O'Reilly's loss prevention auditor, testified that as part of his investigation of the theft, he filed a blind complaint with the police department on the day after he suspended Mr. Deckard indefinitely without pay. Initially, Mr. Dowell denied that the reason he filed a blind complaint was because he did not know who made the fraudulent tickets. However, Mr. Dowell was impeached with his testimony from a prior hearing where he admitted that he filed the blind complaint because he honestly did not know who committed the theft. Furthermore, Mr. Deckard testified that Mr. Dowell told him that he was fired for loss of confidence. Mr. Dowell confirmed that Mr. Deckard was fired for loss of confidence, and not for theft, in his own testimony. The following exchange then occurred:

Q: Mr. Dowell, your testimony was Mr. Deckard was not fired for theft, is that correct?

---

5. Clear and convincing evidence is evidence that instantly tilts the scales in the affirmative when weighed against the evidence in opposition and that causes the fact finder to have an abiding conviction that the evidence is true. *Lopez–Vizcaino v. Action Bail Bonds, Inc.,* 3 S.W.3d 891, 893 (Mo.App. W.D.1999).

A: Yes.

Q: So if anybody was told he was fired for theft that was a lie? If a customer, for example, was told he was fired for theft that would be a lie?

A: Yes.

Q: And if any of the other employees in the store were told that he was fired for theft that would be a lie?

A: Yes.

Yet, despite the facts that O'Reilly did not know who committed the theft and that it fired Mr. Deckard for loss of confidence, Mr. Kaltenbach and Mr. Greven told Mr. Barger and Ms. Crouch, respectively, that Mr. Deckard was fired for theft.[6] Mr. Greven acknowledged at trial that he understood Mr. Deckard was fired for loss of confidence, not for theft. Evidence was also offered that Mr. Kaltenbach also knew the reason for Mr. Deckard's termination. As district manager, Mr. Kaltenbach's duties included overseeing the operation of the individual stores and handling problems that arose with employees or customers. The evidence revealed that Mr. Kaltenbach was involved with every aspect of the incident involving Mr. Deckard and that Mr. Dowell discussed the suspension and firing of Mr. Deckard with Mr. Kaltenbach. Such evidence indicated that Mr. Kaltenbach and Mr. Greven made the defamatory statements about Mr. Deckard at a time when they knew the statements to be false or, at the very least, when they did not know whether the statements were true. Mr. Deckard, therefore, made a submissible case of actual malice to defeat or overcome the qualified privilege that existed regarding O'Reilly's communications to Mr. Barger and Ms. Crouch. The point is denied.

■ Finally, O'Reilly contends that insufficient evidence was presented that its communication to Ms. Crouch damaged

Mr. Deckard's reputation. It initially claims that the record supports the conclusion that Ms. Couch did not consider Mr. Deckard's reputation to have been damaged as evidenced by their continuing friendship. While Ms. Crouch did testify that she and Mr. Deckard remained friends after he was fired, she also testified about Mr. Deckard's overall reputation in the community before and after he was fired. After stating that prior to being fired, Mr. Deckard had a good reputation, Ms. Crouch testified as follows:

Q: What was it after he was fired from O'Reilly's?

A: A lot of questions on whether it was good or bad. I mean, there was a lot of doubt.

Such evidence implied not only that O'Reilly's statement that Mr. Deckard was fired for theft had become common knowledge within the community, but also indicated that Ms. Crouch was aware of a decline in Mr. Deckard's reputation within the community. *Nazeri*, 860 S.W.2d at 314; *Balderree v. Beeman*, 837 S.W.2d 309, 325 (Mo.App. S.D.1992). Sufficient evidence was, therefore, presented that O'Reilly's communication to Ms. Crouch damaged Mr. Deckard's reputation.

Next, O'Reilly argues that even if sufficient evidence was presented that Mr. Deckard's reputation had been damaged, Ms. Crouch first learned that Mr. Deckard was fired for theft from Mr. Deckard himself, thus breaking any causal connection between O'Reilly's statement to Ms. Crouch and damage to Mr. Deckard's reputation. The record, however, refutes this argument. The record reveals that although Mr. Deckard told Ms. Crouch on the evening of January 30 that O'Reilly "had accused him of making a ticket and taking money for it," that he did not do it, and that he was suspended until further

---

**6.** O'Reilly did not assert at trial or in its points relied on in this appeal that Mr. Kaltenbach or Mr. Greven were not acting within the scope of employment when they made the defamatory statements about Mr. Deckard.

*See Carter,* 714 S.W.2d at 511 (holding that an employer is liable for the defamatory statement of an employee if the employee was in the scope and course of employment when publication of the statement occurred).

notice, Ms. Crouch first learned that Mr. Deckard had been fired for theft the next morning when Kevin Greven, the store manager, told her and another employee that Mr. Deckard "would no longer be with us because he had been making false tickets and stealing money." The evidence suggests that a nexus existed between O'Reilly's statement and the damages claimed. Mr. Deckard, therefore, made a submissible case that O'Reilly's communication to Ms. Crouch damaged his reputation. The point is denied.

### IV. Conclusion

In conclusion, O'Reilly's communications to Joe Barger and Jami Crouch were qualifiedly privileged; therefore, verdict directing instructions based on MAI 5th 23.10(2) and the corresponding burden of proof instructions based on MAI 5th 3.05 should have been submitted with regard to those communications. Additionally, Mr. Deckard presented sufficient evidence to support his defamation claims regarding O'Reilly's communication to Mr. Barger and Ms. Crouch. Mr. Deckard's claim that O'Reilly communicated a defamatory statement about him to Scott Anderson, however, was not supported by substantial evidence. Because the verdict directing instruction submitted Mr. Deckard's three theories of liability in the disjunctive, the trial court erred in giving the instruction. The judgment is, therefore, reversed, and the case is remanded for a new trial.[7]

LOWENSTEIN, P.J. and HOLLIGER, J. concur.

---

7. O'Reilly's remaining points on appeal are not addressed.